## UNITED STATES DISTRICT COURT
## FOR THE NORTHER DISTRICT OF GEORGIA
## ATLANTA DIVISION

**URSULA CAPITAL PARTNERS,
LP, et al.,**

        **Plaintiffs,**

        **vs.**

**CROWE U.K. LLP,**

        **Defendant.**

**Civil Action No. _____**

**JURY TRIAL DEMANED**

### PLAINTIFFS' COMPLAINT

Plaintiffs, for their Complaint against Crowe U.K. LLP ("Crowe" or "Defendant"), allege as follows:

### SUMMARY OF THE ACTION

1.     This case arises out of the false written and oral representations made by Crowe that caused Plaintiffs to invest tens of millions of dollars into a company whose supposed business was essentially a complete fiction with fictional revenues, fictional expenses and fictional assets. Crowe served as the independent auditor for a privately-held company called Akazoo Limited ("Old Akazoo" or the "Company). Old Akazoo purported to operate a streaming music service—like Spotify—focused on the developing world. In early 2019, Old Akazoo agreed to merge with a company called Modern Media Acquisition Corp. ("MMAC"). MMAC was a

publicly-traded special purpose acquisition company or SPAC. The merger resulted in the formation of Akazoo S.A. ("New Akazoo" or "Akazoo").

2.     Under the merger agreement governing the transaction, Old Akazoo would contribute its (fake) rapidly growing streaming music business, which purportedly had millions of paying subscribers, that generated over €105 million ($124 million) in reported annual revenue during 2018. In return, MMAC would contribute $53 million to New Akazoo to fund the business going-forward. The $53 million would come from two sources. First, before the merger, MMAC had raised money from public investors; the pre-existing investors would have to agree to roll their investments over into New Akazoo. Second, MMAC raised almost $40 million in additional money from investors pursuant to an investment called a private investment in public equity or "PIPE." Plaintiffs are either pre-existing MMAC shareholders who approved the merger ("SPAC Investors") or PIPE investors ("PIPE Investors"). Within a few months of the merger closing, however, Akazoo's streaming music business was revealed to be a complete fabrication, and the New Akazoo stock acquired by Plaintiffs was rendered worthless.

3.     Crowe bears direct responsibility for Plaintiffs' losses from Akazoo. Old Akazoo was a private company before the merger and thus shielded from outside scrutiny . . . except from Crowe. As a result, Crowe's imprimatur played an outsized role in convincing investors to contribute money to New Akazoo. Crowe negligently

performed its work as an auditor and—based on what it learned and ignored about the Company and its purported business—should never have issued its auditor's report on the Company's financial statements, much less one with an unqualified or "clean" opinion, and thereby failed to alert potential investors of the fraud (or actively participated in the fraud on the investors) in two broad ways as detailed below.  First, Crowe's purported "audit" was in fact no audit at all; Crowe not only failed to address obvious "red flags," but also did not comply with even the most basic professional audit standards.  Yet Crowe issued a "clean" audit report with essentially no basis for doing so—and did so knowing that the audit report was intended for investors to rely on.  Second, Old Akazoo's management—with the assistance of Crowe, by omission or commission—was able to pull off the fraud in part by telling two different stories about how the Company supposedly operated: management described the business to Crowe in a way designed to pass audit scrutiny, but then described the business to potential investors in a way designed to deflect investor questions.  Only Crowe knew about this shape-shifting business narrative, but never said a thing.  Further, Crowe participated, with and without Old Akazoo management, in presenting the modified "investor-friendly" business narrative directly to MMAC and to other potential investors or their respective representatives.

4.      In late 2018, while MMAC and Old Akazoo were discussing a merger, MMAC and its consultants performed due diligence on Old Akazoo.  A substantial portion of such diligence relied on Crowe's work.  For example, Crowe provided MMAC with a copy of an internal report purportedly prepared by Crowe detailing its audit findings, and Crowe participated in multiple calls with MMAC to answer questions about the financial aspects of Old Akazoo's operations.  Relying on the answers and assurances provided by Crowe, in February 2019, MMAC agreed to merge with Old Akazoo with closing set for later in 2019.

5.      After MMAC and Old Akazoo signed a merger agreement in early 2019, MMAC and Old Akazoo filed with the Securities and Exchange Commission a Proxy and Registration Statement ("Registration Statement").  The Registration Statement was required to obtain approval of the merger from MMAC's existing shareholders and to register the New Akazoo stock for public trading.  In addition, the subscription agreement for the PIPE Investors ("Subscription Agreement") expressly incorporated the Registration Statement and represented that it was accurate.  The Registration Statement included Crowe's audit reports which any reader would presume were based on audits of Old Akazoo's 2017 and 2018 financial statements.  In addition, the Registration Statement—in its narrative sections and within the "audited" financial statement footnotes—described the business of Old Akazoo, which would form the operating business of New Akazoo.

Crowe not only expressly consented in writing to inclusion of its audit report (along with the associated financial statements)—knowing Plaintiffs would rely on it—but also reviewed the entire Registration Statement multiple times and discussed its contents with Old Akazoo management.

6.      The Registration Statement described at length that the key to Old Akazoo's success was its "partnerships" with various telecommunications companies—mobile phone providers—around the world.  In partnership with Old Akazoo, these companies allegedly would bundle Akazoo's streaming music application on mobile phones, and thus Akazoo was able to reach millions of subscribers around the world.  It had neither such arrangements, nor millions of subscribers.

7.      In the weeks before the merger closed in September 2019, MMAC refreshed the due diligence work it had done in late 2018 and early 2019.  As part of this process, MMAC's consultants were provided additional material from Crowe and conducted an additional call with Crowe.  Representatives of the PIPE Investors also participated in a call with Crowe to obtain answers to various questions.  As detailed below, Crowe provided assurances about the purported extent of their audit work, and never whispered a word about any concerns regarding Old Akazoo's business or the way it had been portrayed in the Registration Statement or the "audited" financial statements.

8.    The merger closed on September 11, 2019, and on the same day, the stock of the newly merged entity—New Akazoo—began to trade on the public market.  By April 2020, the fraud had begun to be exposed, and New Akazoo stock was revealed to be essentially worthless.

9.    In April 2020, a short seller raised questions about the true nature of Akazoo's business in a written report ("Short Seller Report"), and whether it actually existed.  In response, the Akazoo Board of Directors, which included primarily people with no prior association with Old Akazoo, announced the formation of a Special Committee to investigate the disclosures in the Short Seller Report.  The short seller's conclusion was correct:  Akazoo had no partnerships with telecommunications providers, very few real subscribers, almost no real business, and almost no real assets other than what was left of the PIPE investor funds.

10.    On May 1, 2020, the Board announced that it had terminated Akazoo CEO Apostolos Zervos and that the 2016, 2017, and 2018 financial statements of Akazoo that had been audited and reported upon by Crowe should no longer be relied upon "due to the possibility that such financial statements contain material errors." That same day, the Nasdaq halted trading in Akazoo's stock; the stock is effectively worthless.

11.    This begged the question: If Old Akazoo had no real business, how could Crowe have performed audit work consistent with professional standards, as

it represented it had done, and issued a "clean" audit report on financial statements that reflected revenues and assets of tens of millions of Euros resulting from thousands of transactions and assets?  It turns out that Old Akazoo told Crowe the business was operated in very unusual and strange way.  Specifically, Old Akazoo claimed to have outsourced essentially all of its business—*e.g.*, marketing, acquiring customers, collecting revenues, and paying most of Old Akazoo's expenses—to three very odd and nondescript third-party "aggregators."  This directly contradicted the narrative Old Akazoo relayed to investors, with Crowe's knowledge, that the Company's business was based largely on  partnerships with large telecommunications entities.  As a result, Crowe was told that essentially all of Old Akazoo's business was not transacted by itself, but rather it was conducted by these so-called aggregators.  According to Old Akazoo's management, the aggregators would collect all subscriber payments, which comprised almost all of Old Akazoo's revenue, from telecommunications providers with whom the aggregators, not Old Akazoo, had arrangements.  The aggregators of course could not pay Old Akazoo this subscriber money—since the subscribers did not exist.  Instead, the story was that the aggregators would keep the money.  The aggregators would then use a portion of the money supposedly obtained from subscribers to pay expenses incurred by Old Akazoo, and the balance would represent accounts receivable shown as assets on Akazoo's "audited" balance sheet.  As a result of this alleged business model,

almost of Old Akazoo's financial existence was evidenced solely by short, monthly reports of activity supposedly issued by the aggregators, invoices issued by Old Akazoo to the aggregators, and some highly unusual agreements (described in more detail below) in which third-party vendors of Old Akazoo would agree to release Old Akazoo of liability for the vendors' invoices and instead look to these totally obscure aggregators for payment. The three aggregators were called Zed Media, Smart Mobile, and Aragona. All were fake names for fictional entities.

12.     Shockingly, Crowe did essentially nothing to investigate the legitimacy of these entities (either the aggregators or the vendors) or the validity of the reported transactions involving these entities. Crowe did not try to speak to anyone who actually worked at any of these entities whose significance to Old Akazoo's business cannot be overstated. Crowe was given a single email address for a single person who allegedly represented each aggregator and no additional contact information. Crowe apparently did search the internet to find contact information for each aggregator and found nothing—none of the aggregators had any internet presence. Even though these aggregators purportedly performed all financial business transactions of Old Akazoo, Crowe performed zero audit procedures on the aggregators. As described in detail below, this omission by Crowe violated the professional auditing standards regarding third-party services and in and of itself rendered any representation by Crowe that it had audited Old Akazoo a fiction. In

short, without performing audit procedures on the aggregators, Crowe's audit was in reality no audit at all. As "proof" that the aggregators and some of the underlying transactions with the aggregators were real, Crowe relied exclusively on a set of "confirmations" that were purportedly sent to the aggregators <u>by the Company and returned to the Company by email</u>.  Worse, the circumstances under which these "confirmations" were returned raised all sort of red flags.  This confirmation process clearly violated professional standards for testing the bona fides of business activity and common sense.  In short, it was no confirmation process at all.

13.  When Crowe initially performed its audit of Old Akazoo's 2018 financial statements ("2018 Audit"), the Company provided a set of records to Crowe and told Crowe that it had sent out confirmations to the aggregators to confirm various balances reflected on the financials.  Within a few weeks, the Company claimed that the initial set of records upon which these confirmations were based were completely wrong, missing many months of activity from 2018 because allegedly Old Akazoo's accounting staff was too busy to input the correct information.  While this discrepancy and nonsensical "explanation" alone raised red flags, one of the (fake) aggregators actually returned the earlier confirmation that confirmed a balance which the Company claimed was wrong by many millions of Euros by the time the confirmation was returned.  These contradictions were obvious badges of fraud.  Crowe never asked how the aggregator's internal records could be

wrong in the exact same way as Old Akazoo's records.   Again, professional skepticism—and basic common sense—should likely have required Crowe to withdraw from the engagement and at the very least to refrain from issuing a "clean" opinion on the Company's financial statements.

14.     Shockingly, even though these balances reflected the overwhelming majority of Old Akazoo's revenues, receivables, and reported expenses, Crowe did not perform any audit procedures on the aggregators and further did not receive "corrected" confirmations until *the day before* it signed off on the 2018 Audit.  Old Akazoo's management was putting intense pressure on Crowe to sign off on their audit of the 2018 financial statements and issue Crowe's associated audit report so that Old Akazoo could file them with the SEC.  Apparently, at the last minute, the partner in charge of Crowe's audit realized that something was amiss about the balances with the aggregators; among the issues, the partner realized that while Crowe had been given paperwork (which on its face was highly suspect) to support the balances, Crowe did not have <u>any</u> formal confirmation documentation.   In response to Crowe's request, Old Akazoo's management then produced signed confirmations purportedly sent to and returned signed by the aggregators, who were located in time zones from Belize to Cyprus to Singapore, on that very day.  Again, professional skepticism and common sense should likely have required Crowe to resign much less issue a "clean" auditor's report.

15.    Plaintiffs include PIPE Investors ("PIPE Investor Plaintiffs") and SPAC Investors ("SPAC Investor Plaintiffs") (together with the PIPE Investor Plaintiffs, "Plaintiffs") whose collective investments total approximately $40 million.  Plaintiffs have lost their entire investment.

16.    Crowe made multiple misrepresentations about Old Akazoo and Crowe's "audits."  First and foremost, Crowe falsely stated that Old Akazoo's financial statements presented fairly the financial position, results of operations, and cash flow of the Company, and falsely represented that Crowe had conducted audits in accordance with professional standards promulgated by the Public Company Accounting Oversight Board ("PCAOB").  Obviously, the financial statements presented a completely false picture of the Company's financial position, results of operations, and cash flow, because almost all of the revenue and expenses and assets were fictional.  At best, Crowe made these misrepresentations grossly negligently, and at worst, Crowe acted with reckless disregard for the truth and proactively knowingly participated in the fraud on the Plaintiffs.  Crowe utterly failed to perform the most basic audit procedures required by the applicable professional standards it professed it was following, let alone enhanced procedures required in response to illogical and suspicious Company assertions, in order to attest that the financial statements were fairly presented.  Most glaringly, Crowe did almost nothing to confirm the existence of or test the internal controls of the aggregators (and, in fact,

when they searched for them, they couldn't even validate their existence) or whether any of the Old Akazoo revenue they purportedly generated, or the majority of Old Akazoo's expenses, assets, or cash flows, were real. Moreover, the notes to the financial statements contained false and misleading statements, such as representing that the Company faced no credit risk when in reality over half of its reported assets consisted of tens of millions of Euros in receivables owed by only three aggregators whose existence, let alone financial capabilities, were not and could not be verified.

17.    Second, the Registration Statement contains numerous statements in its portrayal of Old Akazoo's business which were false and misleading even when compared with the false portrayals Old Akazoo management gave to Crowe. Whereas Crowe knew how Old Akazoo claimed to operate through aggregators, yet the Registration Statement and the audit report written and signed by Crowe and contained within the Registration Statement ("Audit Report") make almost no reference to the aggregators and even the one or two oblique references grossly understate their purported role. In short, the Registration Statement completely misrepresents the way Old Akazoo operated in a way that was contrary to the description provided by Old Akazoo management to Crowe and on which basis Crowe supposedly audited the Company's financial statements. Crowe had to have known this. This misrepresentation was highly material, not the least of which because the aggregators turned out to be 100% fake and thus almost all of Old

12

Akazoo's business and assets were fake too.  Crowe is responsible for these misrepresentations either directly or as an aider and abettor of the fraud perpetuated by Old Akazoo in making these representations.

18.   Third, Crowe made written and oral misrepresentations directly to MMAC's consultants and representatives of the PIPE Investors.  For example, during the due diligence process, Old Akazoo provided to MMAC and its consultants with a copy of Crowe's Audit Findings Report ("AFR"), a detailed report that Crowe prepared after each audit to give Old Akazoo's management their insight into Old Akazoo's financial and internal control matters.  However, before providing the AFR to MMAC and its consultants, Old Akazoo's management suggested extensive changes to the report, which was ostensibly Crowe's report, not management's.  Crowe accepted these changes. For example, the edited AFR deleted the names of the aggregators; as noted above, anyone who had the names could perform an internet search and determine that something was amiss because there was no evidence any such companies doing millions of Euros in business existed. The edits also deliberately obscured the extent to which Old Akazoo's business allegedly was conducted through aggregators.  MMAC's consultants raised various questions about the edited AFR; in particular, MMAC's consultants asked who had made the edits—management or Crowe.  Understandably, MMAC consultants would be less skeptical if a third-party like Crowe who was represented to be

independent of Old Akazoo, had made edits based on its professional judgment. Old Akazoo's management worked with Crowe to provide answers to MMAC's questions, and in response to the question about who made the edits, MMAC's consultants were told that Crowe sourced the edits when in fact they were initiated by management and surprisingly agreed to and published by Crowe. Crowe proactively facilitated this fraudulent characterization.

19.     As a result of Crowe's misrepresentations and its failure to identify and expose the material misrepresentations in Old Akazoo's financial statements (and in fact profess the opposite), Plaintiffs invested $40 million in a company that was a complete sham. Plaintiffs bring this action for the damages they thereby suffered.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and §22 of the Securities Act of 1933, 15 U.S.C. §77t.

21.     This Court has personal jurisdiction over Crowe because 15 U.S.C. 77v(a) authorizes nationwide service of process, and by consenting to inclusion of its Audit Report in Akazoo's filings with the SEC and speaking by phone in various calls with MMAC's consultants RSM and the PIPE's Investors' representative while these representatives were located in the United States, Crowe had sufficient contacts with the United States to satisfy minimum contacts. *See Reingold v. Deloitte*, 599 F. Supp. 1241, 1259 (S.D.N.Y. 1984); *see also Alpha Capital Anstalt*

*v. New Generation Biofuels, Inc.*, 2014 WL 6466994, at *7 (S.D.N.Y. Nov. 18, 2014). As a result, any federal court in the United States can exercise personal jurisdiction over Crowe. This Court can exercise pendant personal jurisdiction over Crowe with regard to Plaintiffs' state-law claims.

22.     Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) & (3). MMAC and MMAC Acquisition Corp S.A. (renamed New Akazoo) were based in Atlanta, Georgia when Plaintiffs invested in either entity based on Crowe's misstatements.

## PARTIES

23.     Plaintiffs are PIPE Investors and SPAC Investors who collectively invested approximately $40 million to fund the business combination between Old Akazoo and MMAC. The PIPE Investor Plaintiffs include: Martin Sprock; Delta Master Offshore II, LP; Ursula Capital Partners, LP; Carson Levit as Trustee for the Levit Family Revocable Trust; David Campbell; M. Kingdon Offshore Master Fund; Walter Buckley III; Spirit Foundation; Trifecta Streaming LLC; Michael Klump; James Faulkner; Michael Bateman; Paul Izlar; Read Northen Jr.; WCG Ventures, LLC; Costa D'Oro LP; Sage Financial LLP; Carter Pope as Trustee of the Carter Davidson Pope Revocable Trust; Thomas Calcote; Tim J. Mahler; Kevin Wagner; RSN Holdings 1; GJR II LLC; Kirk Drucker; Alex Reese as Trustee of the Alexander S. Reese Trust; John Reese; Matthew Paige; Swann Ridge Properties, LLC; James

Pirtle as Trustee of Ronald Schiavone 2010 Irrevocable Trust; J. Christopher Burch; Jongo, LLC; John Russell Allen; Roslyn Ridge, LP; Ken Ramberg as Trustee for Tower Trust; Brandon Jones; John Zamer; Joseph M. Ferguson III; David Eidelman as Trustee for the Rachel Eidelman 2012 Family Trust; Keith C. Wagner; Scott Texeira; Michael Kerkorian; Jeff Miehe; Greg Kennedy; Monica Teplis; Steven Dark; Tri Drucker; and David W. Unger. The SPAC Investor Plaintiffs include Virginia Dadey and Louis Teplis.

24.    Defendant Crowe U.K. LLP ("Crowe") is a registered public accounting firm and was the independent auditor of Old Akazoo's consolidated financial statements for the years ended December 31, 2018, 2017, and 2016, and the related consolidated statements of profit or loss and other comprehensive income, changes in equity and cash flows and the related notes for each of those three years.

## FACTUAL ALLEGATIONS

### I.    Old Akazoo.

25.    Old Akazoo purported to offer a streaming music service—like Spotify—that focused on the developing world. Old Akazoo offered an application that could be preinstalled or downloaded onto a mobile phone. Old Akazoo started in Greece but was eventually acquired by a United Kingdom-based company called InternetQ. While Old Akazoo's top executives began offices in the United

Kingdom, the company's finance function remained in Greece, and its two purported operating subsidiaries were located in Cyrus and Dubai.

26.     In 2015, InternetQ spun off Old Akazoo. Old Akazoo therefore needed to hire its own, independent auditor.   In 2016, Crowe agreed to serve as Old Akazoo's auditor, starting with Crowe's audit of the 2015 financial statements.

27.     Significantly, also in 2015, a short seller called Quintessential Capital Management exposed as a fraud a company called Globo PC.   (Quintessential Capital Management eventually exposed Akazoo as a fraud too.)   Globo offered a mobile application, was located in Greece, and operated through shell companies located in jurisdictions infamous for lack of transparency.   Upon information and belief, Plaintiffs allege that when Crowe agreed to work for Old Akazoo, Crowe was concerned that Old Akazoo might pose a similar fraud risk as Globo because of similarities between the two.   Nevertheless, Crowe agreed to work for Old Akazoo as its auditor.

**II.    New Akazoo.**

28.     In May 2017, MMAC, which was headquartered in Atlanta, Georgia, raised $209 million in an initial public offering; MMAC intended to use the proceeds to fund an acquisition in the event MMAC found a suitable target.   By the end of 2018, MMAC was in serious discussions to merge with Old Akazoo.

29.     By late 2018, Old Akazoo claimed to have over 4 million subscribers. Old Akazoo purported to have achieved massive growth in revenues growing from €17 million in 2015 to €90 million in 2017, and predicted even larger growth once the 2018 numbers were finalized.  Conspicuously, despite this massive growth in revenues, the Company was cash strapped; in fact, as of the end of 2017, Old Akazoo reportedly had only €2 million of cash or cash equivalents on hand.  While the Company's precarious cash position appeared concerning, the Company reported over €31 million in trade receivables as of year-end 2017.  By the end of 2018, Old Akazoo was on the verge of running out of money.  Indeed, Old Akazoo would not have been a going concern except for two things.  First, Old Akazoo claimed it was owed tens of millions of Euros in receivables and once collected, Old Akazoo would be solvent.  Second, Old Akazoo was counting on closing a transaction with MMAC that would provide needed capital.  Crowe was aware of this.

30.     As part of its due diligence, in November 2018, MMAC hired the accounting and consulting firm RSM to help with due diligence, and in particular to evaluate Old Akazoo's financial statements and reporting of revenue and receivables.  RSM conducted its initial work in December 2018 and January 2019. As part of that work, RSM evaluated Old Akazoo's audited 2017 financial statements ("2017 Audited Financial Statements), which Crowe has audited.  As well, Crowe had provided Old Akazoo management with a detailed Audit Findings

Report for the 2017 audit ("2017 AFR"). The 2017 AFR contained a lengthy narrative report on Old Akazoo's business and financial results and described the audit-related work Crowe performed during the audit. Crowe agreed with Old Akazoo management that the AFR could be shared with RSM. RSM also held teleconferences with Crowe personnel in December 2018 and January 2019. RSM conducted its work from its offices in the United States. During the December 14, 2018 call, Crowe specifically told RSM that Crowe had "tested external revenues in full." As outlined below, Crowe's claims about fulsome audit testing were wildly misleading.

31. Crowe knew that the purpose of the calls was to provide information that MMAC and its shareholders would rely upon in evaluating and ultimately agreeing to the merger agreement and subsequently voting to approve the transaction. Moreover, the 2017 AFR that Crowe provided to RSM was prepared specially for RSM; it was not the version that Crowe had provided to Old Akazoo management, but rather was a revised version ("2017 Revised AFR"). Crowe intended and knew that the 2017 Revised AFR would be relied upon by Plaintiffs in making their decision to invest in Akazoo.

32. On January 24, 2019, MMAC and Old Akazoo signed a Business Transaction Agreement ("Merger Agreement"). The Merger Agreement called for MMAC to merge into a newly-created entity called Modern Media Acquisition, S.A.

19

("MMASA"), and then Old Akazoo essentially would merge into MMASA. (Although MMASA would be a Luxemburg Company and after the merger would be headquartered in Luxemburg, MMASA was headquartered in Atlanta, Georgia until the merger closed.). The resulting combined entity would be renamed Akazoo and its securities would be publicly traded.  The Merger Agreement required that MMAC have at least $60 million (later revised to $53 million) on hand when the merger closed that could be used to fund Akazoo's business operations.

### III.   Crowe and Akazoo's Initial Misleading Public Disclosure.

33.   To facilitate the merger, MMAC, Old Akazoo, and MMASA had to make certain disclosures with the SEC.  To explain, although MMAC originally raised approximately $207 million in connection with its IPO, its shareholders had the right to redeem their shares and get back their initial investments, which many did even before MMAC and Old Akazoo reached their merger agreement. Each remaining MMAC shareholder—including many Plaintiffs—had a decision to make: redeem their MMAC shares for cash and get their investment back, or vote for the business combination to be completed and roll their shares into the right to receive shares in Akazoo. MMAC's Certificate of Incorporation made approval of the business combination contingent on an affirmative vote of a majority of the outstanding MMAC shares. In order to solicit votes for a merger, a public company, such as MMAC, must provide shareholders with a proxy statement.  As well,

because the MMAC shareholders—as well as all other investors—would end up with new MMASA stock, MMASA needed to provide a prospectus for this newly-issued stock.  As a result, in February 2019, MMAC, Old Akazoo, and MMASA filed with the SEC a joint, draft Proxy Statement and Prospectus ("February Proxy").

34.     Before the February Proxy was filed, Crowe was given drafts.  Crowe read the entirety of the February Proxy and provided extensive comments to Old Akazoo for changes that should be made to various parts of the February Proxy. Moreover, Crowe sought guidance and review comments from its affiliate in the United States, Crowe LLP. Crowe did this work because it was obligated to do so under (among others) Auditing Standard ("AS") 4101.10, which states that before an auditor can permit use of its auditor's report on financial statements in a subsequently-filed registration statement, the auditor must "[r]ead the entire prospectus and other pertinent portions of the registration statement."

35.     The February Proxy made clear to Crowe that the entity who was making the filing was located in Atlanta, Georgia:

Registration No. 333-

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
#### Washington, D.C. 20549

## FORM F-4
## REGISTRATION STATEMENT
*UNDER*
*THE SECURITIES ACT OF 1933*

# MODERN MEDIA ACQUISITION CORP. S.A.
(Exact name of Registrant as specified in its charter)

| Luxembourg | 7370 | Not Applicable |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification No.) |

3414 Peachtree Road, Suite 480
Atlanta, Georgia 30326
(404) 443-1182
(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)

Lewis W. Dickey, Jr.
President and Chief Executive Officer
3414 Peachtree Road, Suite 480
Atlanta, Georgia 30326
(404) 443-1182
(Name, address, including zip code, and telephone number, including area code, of agent for service)

36.     The February Proxy contained Crowe's audit report for their 2017 audit representing the following:

**Opinion on the Financial Statements**

We have audited the accompanying consolidated statement of financial position of [Old] Akazoo Limited (the "Company") and its subsidiaries (together with the Company, the "Group") as of December 31, 2017, 2016 and 2015 and the related consolidated statements of profit or loss and other comprehensive income, changes in equity and cash flows for each of the three years in the period ended December 31, 2017, 2016 and 2015 and the related notes numbered 1 to 20 (collectively referred to as the "financial statements"). In our opinion, the financial statements **present fairly, in all material respects, the consolidated financial position of the Group** as of December 31, 2017, 2016 and 2015 and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2017, 2016 and 2015 in conformity with International Financial Reporting Standards, as adopted in the European Union.

**Basis of Opinion**

. . . .

**<u>We conducted our audits in accordance with . . . the standards of the Public Company Accounting Oversight Board (United States)</u>**.

. . . .

**Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks.** Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

(emphasis added).  Notably, although Old Akazoo was a private company with only European investors during 2017, Crowe represented that it conducted the 2017 audit under the rules applicable to public companies in the United States.  Crowe understood that it had been hired to conduct its audit in this manner because the audit was intended for use in the SEC filings to be used in raising funds from investors in what would become a public company.  As well, because Crowe was purporting to audit under the PCAOB standards and consenting to inclusion of the auditor's report in SEC filings, Crowe UK consulted with its affiliate based in the United States in connection with its audit work and the SEC filings.

37.     In addition to the financial statements, the February Proxy contained a lengthy description of Old Akazoo's business, since that would be the operating

business of the newly-formed entity. Crowe was provided with multiple drafts of the February Proxy before it was filed and asked to and did provide comments on the February Proxy. On information and belief, Crowe consulted with its affiliate in the United States about any comments on the February Proxy.

38.     The February Proxy repeatedly represented that Akazoo had entered into "partnerships" with "blue chip," "regional and local" mobile phone companies and original equipment manufacturer ("OEM") providers:

> ***Local Partnerships***. Akazoo gains access to millions of potential users worldwide through its relationships with local blue-chip telco, mobile messaging and OEM providers. Through bundles, free trials, pre-loading and promotions, Akazoo benefits from the conversion of a portion of its partners' customer bases into Akazoo subscribers. Akazoo also offers its partners customized user interfaces, cloud-based and local transcoding infrastructure and complete integration with partners' platforms where applicable. These partnerships are especially impactful in Akazoo's target regions given the decidedly "mobile-first" nature of emerging markets.

February Proxy, at 134. The February Proxy touted that Old Akazoo had "de-risked customer acquisition" by "historically enter[ing] into partnership agreements with telecommunications providers, messaging platforms, OEMs and brands to help grow its Subscriber base . . . ." *Id.* The February Proxy explained that "[b]y partnering with regional and local telecommunications services, mobile messaging companies and device manufacturers and OEMs, Akazoo is able to quickly and efficiently access a wide swath of its target customers. Akazoo has built and expects to continue to build relationships with these companies in every market where Akazoo currently

24

has a presence, and plans to continue to do so as Akazoo enters new markets." *Id.,* at 135. The February Proxy explained that these partnerships were key to its future: "Akazoo increasingly drives growth through strategic B2B partnerships with messaging services, MNOs, ISPs, OEMs and brands through co-promotion or bundling offers." *Id*., at 136. As result, the February Proxy explained that "such partnerships are expected to remain a key part of [New Akazoo's] sales and distribution channels and growth strategy." *Id*., at 49. The February Proxy detailed "[r]eaching and maintaining agreements with such partners involves significant investments of time, resources and work in design and integration . . . ." *Id*. The February Proxy described some of the terms and conditions of its "distribution partnerships," including the termination provisions and exclusivity provisions. As detailed below, Old Akazoo, in fact, <u>had no partnerships</u> or contractual relationships with any telecommunications companies, OEMs, social messaging providers, or internet service providers.

39. The foregoing description of its "partnerships" was utterly false as Crowe knew full well. Instead, Crowe had been told by the management of Old Akazoo that the Company had agreements with three otherwise unknown companies it referred to as "aggregators" allegedly had some sort of unknown arrangements with telecommunication companies all over the world under which the telecommunications companies would market to their subscribers Akazoo's

streaming music service. For example, a cell phone company in Brazil might include Akazoo's streaming service on phones sold to customers.  The aggregators allegedly would collect from the telecommunications providers all revenue associated with these subscribers, pay substantial expenses on behalf of Akazoo, deduct its "commissions," and then later remit the remainder, if any, to Akazoo.

40.     The three aggregators were named Smart Mobile, Aragona, and Zed Media.  Smart Mobile allegedly was based in Singapore and covered Asia—specifically Indonesia, Malaysia, and Thailand.  Aragona allegedly was based in Cyprus and covered Poland and Russia.  Zed Media allegedly was based in Belize City and covered ten Central and South American countries.   These three aggregators accounted for more than 90% of Akazoo's reported revenue.

41.     The February Proxy made no mention of the key role (and attendant risk) supposedly played by the aggregators.  Crowe knew full well that this omission combined with the Proxy's extensive discussion of Old Akazoo's claimed partnerships with telecommunications companies was materially false and misleading in many regards, not the least of which was that it misrepresented the creditworthiness of the counterparties to Old Akazoo's receivables.

## IV.     Crowe Repeatedly Ignores Red Flags During the 2018 Audit.

42.     The completion of the 2017 audit and Crowe's accompanying audit report was sufficient to get the merger process started. In order to close the merger,

though, Old Akazoo would need to produce audited financial statements for 2018. As a result, in March 2019, Old Akazoo began providing information to Crowe so that it could complete its audit of Old Akazoo's 2018 financial statements. Highly suspicious red flags began flying almost immediately during that audit process as well.

43.    By way of background, according to former Old Akazoo employees—including, significantly, the financial staff—even their own communications with the purported aggregators was almost non-existent and was tightly controlled. Only the former CEO Apostolos Zervos ("Zervos") and the former CFO, Paris Triantafyllidis ("Paris") were allowed to have direct contact with the purported aggregators. The Old Akazoo employees did not even have a phone number for any contact at the aggregators. It appears that Zervos and Paris provided employees with a single email address for each aggregator, and other than the name of the email account holder, employees did not know the name of a single other person who purportedly worked at the aggregators or signed documents on their behalf. None of these entities had any meaningful presence on the internet—no website, nor any mention in any industry publications or general interest articles. As a result, no one working at Old Akazoo—other than Zervos and Paris—purported to know anything about the aggregators. Surely, over the four years that Crowe audited Old Akazoo, someone from Crowe must have uncovered this suspicious fact. Further, and as

described in further detail below, audit standards required Crowe to perform substantial procedures on the third parties (the purported aggregators) that oversaw the generation of essentially all revenues, performed all collection and accounting and reported duties related thereto and who engaged and/or paid third parties for certain services rendered to or on behalf of Old Akazoo. Despite Crowe's "understanding" that this was the method of Old Akazoo's business operations, Crowe performed no audit procedures on the aggregators.

44. Conspicuously, Crowe was given copies of contracts with the aggregators, but the contracts do not even purport to match the services that Old Akazoo executives told Crowe the aggregators were providing. The contracts do not mention Old Akazoo or the aggregators forming partnerships with telecommunications providers to distribute the Akazoo application on phones to subscribers, engaging in joint marketing with the telecommunications providers, or collecting on behalf of Akazoo subscriber payments from the telecommunications providers. Instead, the contracts provided to Crowe indicate that the aggregators will provide networks for SMS messaging (text messages) and in return Akazoo will pay the aggregators. For example, the Smart Mobile "contract" states that Smart will provide Akazoo access to the "Smart Platform" which "will enable [Akazoo] to send Mobile Terminated ("MT") SMS messages and receive Mobile Originated ("MO") SMS messages (collectively "Smart Messaging Services") utilizing Smart's

platform." The Aragona contract recites that "[s]ubject to the terms and conditions of the Agreement Aragona agrees to provide Akazoo with the SMS based service as defined herein." The Zed Media contract claimed that Zed would provide "technical integration services" to allow Akazoo "to make interactivity and downloads projects available to users" of services provided by various mobile telecommunications operators.

45.   If the disconnect between what function Crowe was told the aggregators performed and what their contracts said was insufficient to pique Crowe's curiosity, Crowe surely must have noticed that the contracts did not have payment terms that matched what Crowe was told. Crowe was told that the aggregators would collect subscriber revenue, deduct a revenue share percentage as compensation for services, and remit the balance to Akazoo. The Smart Mobile contract provided to Crowe does not even have any revenue share percentages indicated.

46.   While Zervos and Paris could try to hide the fact that the aggregators were fake by limiting communication with the aggregators to a single email address—and Crowe must have known that by itself this limitation was a red flag that a fraud was afoot—they could not hide the fact that the Company's purported one hundred million Euros in revenue was not producing any cash. As a result, Zervos and Paris claimed that the aggregators owed tens of millions of Euros to Old

Akazoo, and that eventually most of this would get paid by having the aggregators directly pay unrelated vendor bills owed by Old Akazoo to purported third parties either to cover operational expenses or to invest in the future growth of the business—such as for software development.  As a result, as of December 31, 2018, Old Akazoo's biggest asset (more than half of all its assets) was a reported €34m in net "trade receivables" of which almost €28m was allegedly owed by the three aggregators.  Old Akazoo claimed that this was the balance due after the aggregators "paid" tens of millions of Euros in fictional third-party liabilities during 2018.  In large part, the aggregators "paid" these "bills" by a three-way agreement or "settlement" that purportedly worked as follows: (1) the third party agreed to release its claim against Old Akazoo and instead look exclusively to the aggregator for payment; (2) the aggregator agreed to accept liability to the unrelated third party; and (3) Old Akazoo released the aggregator for an amount of receivables equal to the third-party bill.  These fake third parties ranged from software development firms to music content providers (licensing companies) to "content delivery networks" (distributed servers around the globe that allow users to download music quickly).  Plaintiffs are aware of no evidence suggesting that Old Akazoo claimed the third parties had any relationship with the aggregators; it remains a mystery how Old Akazoo explained the willingness of these unrelated third parties to release Old Akazoo in favor of looking solely to unknown "aggregators" for payment.  Indeed,

Plaintiffs are not aware of a single example of such an arrangement between unknown third parties with no knowledge of one another, particularly given that the original obligor (Old Akazoo) was purportedly a company with growing profits and presumably valid, collectible receivables. The three-way arrangement simply makes no sense on its face, yet Crowe performed no additional audit procedures to address this obvious fraud risk. Any amount of professional skepticism on the part of Crowe would have caused it to raise simple questions that could not have been satisfactorily answered by Old Akazoo management. Had such skepticism been exhibited, the "audit" process would have come to a grinding halt; Crowe would have resigned without issuing any audit report much less in audit report with the "clean" opinion; and the merger would have been cancelled.

47.     One by-product of the "settlement" scheme was the creation of a huge intangible asset on Old Akazoo's balance sheet. Old Akazoo's second biggest reported asset (42% of all assets) was "intangible assets" recorded at €27 million that consisted almost entirely of purported investments in proprietary software. The vast majority of this investment in software was "funded" by the aggregators via the "settlement" arrangements. A huge portion of this investment purportedly was for software claimed to be "in development." Any reasonable audit effort to verify the existence of this "asset" would have, again, uncovered the entirely fictional nature of the asset and Old Akazoo more generally.

48.    Separate from the aggregators, Old Akazoo was an insubstantial enterprise with few full-time employees, especially in the finance function.  Even the primary finance executive—Paris—gave up his CFO title in late 2018 and operated as a consultant; the actual CFO apparently did little and interacted almost not at all with Crowe.

49.    Crowe performed its very limited and wholly inadequate audit procedures with regard to the 2018 financial statements between March and June 2019.  Plaintiffs believe most of the limited audit work was performed by one employee from Crowe's affiliate in Greece, Despina Markopoulou,[1] and then an audit partner and manager from Crowe UK reviewed the work in the last days before the Audit Report for the 2018 financials ("2018 Audit Report") was signed on June 7, 2019.

50.    In late March 2019, Crowe tried to get Old Akazoo staff to start confirming various amounts reflected on the then-existing financial statements that represented transactions with third parties.  Obviously, the biggest such item was the receivables due from the purported aggregators.   Ms. Markopoulou initially informed Old Akazoo that Crowe would "run this process"—as is required under relevant professional auditing standards—but grew frustrated because Crowe did not

---

[1]    Because Old Akazoo's finance function was run from Athens and not London (where the executives like the alleged CFO was located), Crowe UK outsourced the audit work to its affiliate based in Greece.

have the relevant contact information for various third parties including the three

primary aggregators:

> **From:** Despina Markopoulou <dmarkopoulou@solcrowe.gr>
> **Sent:** Wednesday, March 27, 2019 2:06 PM
> **To:** Vassiliki Prifti <v.prifti@akazoo.com>
> **Cc:** Paris Triantafyllidis <p.triantafyllidis@akazoo.com>; Ioannis Laoupis <i.laoupis@akazoo.com>; palamanos <palamanos@solcrowe.gr>; dsamoilis <dsamoilis@solcrowe.gr>; sbakas <sbakas@solcrowe.gr>; Evangelia Kardakari <ekardakari@solcrowe.gr>; Andreas A. Alamanos <analamanos@solcrowe.gr>; Joanne Beckley <Joanne.Beckley@crowe.co.uk>; Nigel Bostock <Nigel.Bostock@crowe.co.uk>
> **Subject:** Re: Akazoo confirmation letters
>
> Yes we said that we will assist you with this process because things were quite hectic for you.
>
> Bearing in mind that you didnt provide us with all the relevant e-mail addresses, and even though it was quite time consuming for us we have managed to gather only <u>some</u> of the email addresses.
>
> Unfortunately we are unable to find all the correct e-mail addresses from the audited invoices as you have suggested.

Crowe continued that it had assembled a list of emails "through our research from

invoices/relevant sites."   <u>Crowe could not find contact information for Smart</u>

<u>Mobile, Aragona, or Zed</u>.  Ms. Markopoulou copied on these emails the audit partner

in the UK, Nigel Bostock, and his subordinate, Joanne Beckley.

51.    This exchange is shocking because as of March 2019, Crowe had

audited Akazoo's financials for 2015, 2016 and 2017.  In at least the latter two years,

these three aggregators played an equally outsized role in Akazoo's business.  How

in March 2019 could Crowe not have even email contacts for the entities that

accounted for 94% of Old Akazoo's revenues and the material portion of its assets?

52.     In late March and early April 2019, Old Akazoo eventually sent emails to the three aggregators that sought confirmation of receivable balances owed by each to Akazoo as of December 31, 2018.  Crowe was copied on the emails.  Two of three aggregators, Smart Mobile and Aragona, responded by returning signed confirmations to Akazoo, notwithstanding that the letters themselves indicated that the confirmations should be sent directly to Crowe.  Zed Media ignored the requests until May.

53.     As of April 2019, there is zero evidence that anyone from Crowe made any effort whatsoever to even communicate directly with the aggregators, let alone performed professionally mandated audit procedures.  Obviously, Crowe did not have any contact information even if Crowe had wanted to engage in such communications.  Moreover, Crowe apparently tried to search online for contact information (or even websites for the aggregators) and found none.

54.     But the story gets worse.  It turned out that the balances in the confirmations Old Akazoo sent to Smart Mobile and Aragona were not what Zervos and Paris wanted to show in Old Akazoo's financial statements.  It appears that Zervos and Paris—who were distracted from November 2018 to March 2019 with the merger process—had apparently forgotten to create fake reports from the aggregators for the second half of 2018 showing alleged billings collected from subscribers.  Until Old Akazoo "received" these reports, Old Akazoo's finance

department would not be able to generate invoices to the aggregators for to "substantiate" the resulting net receivables due as of December 31, 2018.

55.    As a result, Old Akazoo's general ledgers as of March 2019 were missing tens of millions of Euros in alleged 2018 revenue and potential receivables. To fix the problem, in late April 2019, Zervos and Paris had Old Akazoo's finance staff "request" that the aggregators provide such reports and backdate them to look like they had been sent monthly during the second half of 2018, and then once the reports were received, generate backdated invoices to the aggregators for tens of millions of Euros in revenues (and therefore receivables).

56.    Similarly, Zervos and Paris had apparently forgotten to create documentation to memorialize the aggregators "settling" with third parties to offset a substantial portion of the receivables owed; without such documentation, the amounts owed by the aggregators to Old Akazoo would have been staggering. Again, it appears that Zervos and Paris prepared the relevant documents in late April 2019 (some of was not even done until mid-May 2019), but they backdated the fake agreements to December 31, 2018.

57.    After all of this retroactive and back-dated paperwork was done, Old Akazoo updated its financial records with this bogus information and provided them to Crowe to re-start its audit.  While it is not clear when and what Crowe learned about this series of events, as outlined below, it is clear that at the very least, Crowe

realized shortly before signing the Audit Report that something strange had happened and, even then, accepted a patently obviously false explanation by Old Akazoo's management that would crumble under even basic properly performed audit procedures, let alone the extended audit procedures that the obvious red flags demanded of the audit team.  If it turns out that Crowe knew even earlier—which based on the subsequent events, it must have—then Crowe's defective or non-existent audit work is all the more shocking.  Even if one accepted that Old Akazoo's management just made a mistake in failing to record an entire half year of 2018 transactions until four months into 2019, that is a shocking lack of internal financial controls; the "oversight" should have set off screaming alarms within Crowe, triggering an extreme degree of professional audit skepticism and extended audit procedures—any of which would have readily uncovered the massively material falsity in the financial statements under audit.

58.     During the second week of May 2019, the Old Akazoo finally provided Crowe with "finalized" 2018 financial statements and revised underlying records.  As a result, Crowe re-started its audit work in May 2019, at which point the Company began demanding Crowe complete its audit in a hurry to meet an early June 2019 filing deadline with the SEC.

59.     Once Old Akazoo finally revised its internal records, it was in a hurry to get them audited.  Because the MMAC shareholder meeting was scheduled for

June 12, 2019, Old Akazoo needed to get the audit of the 2018 financial statements completed by June 6, 2019.  Starting in mid-May 2019, Ms. Markopoulou appears to have started working on the 2018 Audit that was supposed and represented to be conducted pursuant to audits standards promulgated by Public Company Accounting Oversight Board ("PCAOB").  Although Old Akazoo was a private company in 2018, the 2018 financials were going to be included in SEC filings, so the audit had to comply with PCAOB standards.  Crowe agreed to and represented that it did follow these procedures.  It is unclear what (if any) experience Ms. Markopoulou, who was based in Greece and appears to be a relatively low-level staff person, had with the PCAOB audit standards.

60.    Since they were critical to Old Akazoo's financial statements, Ms. Markopoulou began to inquire about the confirmations of receivables allegedly owed by Smart Mobile and Aragona.  On May 16, 2019, she wrote an email to Akazoo asking for the Smart Mobile confirmation.  In late March, Ms. Markopoulou had been copied on the first confirmation sent to Smart Mobile that Smart Mobile eventually returned in April signed but confirming the "wrong" balance.  Apparently, Ms. Markopoulou was not copied when Smart Mobile responded.  Ms. Markopoulou's email is telling because she reports that the confirmation for Smart Mobile "came back for not finding the recipient.  Please provide the contact information to confirm the existence of the above":

Message
_____

| | |
|---|---|
| **From:** | Despina Markopoulou [dmarkopoulou@solcrowe.gr] |
| **Sent:** | 5/16/2019 7:13:36 AM |
| **To:** | Paris Triantafyllidis [p.triantafyllidis@akazoo.com] |
| **CC:** | Nigel Bostock [Nigel.Bostock@crowe.co.uk]; Joanne Beckley [Joanne.Beckley@crowe.co.uk]; palamanos [palamanos@solae.gr]; dsamoilis [dsamoilis@solcrowe.gr]; sbakas [sbakas@solcrowe.gr] |
| **Subject:** | Re: Akazoo FINAL MRR & Supporting schedules |
| **Attachments:** | CROWE.png |

Good Morning Paris,

Sorry, I didn't get your phone call yesterday, I was engaged in another audit.

Of course, even if we could communicate, it would be impossible for me to attend your offices today, especially considering the short notice, due to other previously arranged commitments and obligations.

Nevertheless, I understand the urgency of the situation and the intention of all of us is to carry out with the remaining stages of the audit. The earliest for me is tomorrow morning, even though I will have to reschedule and backlog other previous engagements. This will give us time to see and what additional sample we will need to ask you.

In other matters, I would like to draw your attention that the confirmatory letters of:

- Merlin BV
- Smartmobile communications
- 

They came back for not finding the recipient. Please provide us directly with correct contact information to confirm the existence of the above

I'll wait for your confirmation for tomorrow.

Thank you

Despina

(emphasis added). Without access to Ms. Markopoulou's documents and Crowe's audit work papers, Plaintiffs cannot tell what happened here, but perhaps when the original confirmation was sent by Akazoo's staff, she received an error message. Rather than responding with new contact information, the Akazoo employee responded to Ms. Markopoulou by simply sending her copies of incorrect confirmations allegedly signed by someone at Smart Mobile. Ms. Markopoulou

38

appears nonplused at the fact that the email address provided by the company for Smart Mobile "came back for not finding the recipient."

61.    Worse, the amounts on the signed confirmations provided by the company in response to Ms. Markopoulou's May 16 email were the old, "incorrect" amounts.  In other words, Old Akazoo had provided the confirmation that was sent in late March and purportedly signed in April by Smart Mobile.  But since Old Akazoo had revised its ledgers by May 2019, the balances purportedly "confirmed" by Smart Mobile no longer matched the amounts reflected on Old Akazoo's "updated" financial records that Ms. Markopoulou was auditing.  Ms. Markopoulou also was sent a signed version of the incorrect confirmation for Aragona.  This should have made it obvious to Ms. Markopoulou that something was very wrong with the Company's representations regarding its revenues and assets, and in response, Crowe should have performed extended audit procedures to get to the bottom of these dramatic discrepancies—including inquiries of Old Akazoo and the aggregators—to better understand the implications of the disparity.  How could Old Akazoo have failed to contact the aggregators about revenues for six months?  And how could the aggregators have failed to record Old Akazoo's transactions for six months?  The entire set of "facts" as presented by management at Old Akazoo to Crowe did not make any business sense and indicated an extreme lack of internal controls at both Old Akazoo and the aggregators—in other words, it indicated a high

likelihood of fraud.  Crowe's lack of extensive enhanced audit procedures combined with a lack of any auditing of the aggregators was grossly negligent as an audit matter.

62.     On May 21, 2019, Old Akazoo sent Ms. Markopoulou an entirely different set of what the Company claimed were "confirmations" for Smart Mobile and Aragona.  These were a series of documents titled "Balances Confirmations and Reconciliations Procedure" that reflected different December 31, 2018 balances than the earlier confirmations had.  The balances now matched Old Akazoo's "revised" general ledgers.  The documents indicate that an additional €33 million in 2018 revenues—solely from Smart Mobile and Aragona's business—had been discovered since April 2019.

63.     As noted above, creating revenue without some offset would beg the question of where the cash went.  As a result, in addition to the new revenue, the documents indicated that Smart Mobile and Aragona had paid tens of millions of Euros in expenditures incurred by or for Old Akazoo that apparently had <u>also</u> been overlooked in March 2019.  The assumed payment of these expenses raised massive red flags, and it appears Crowe did nothing to investigate whether they were real.

64.     Old Akazoo provided documents to Crowe indicating that Smart Mobile agreed on December 31, 2018 to "pay" €10 million in software development fees to offset its receivables owed to Akazoo.  To support this claim, Old Akazoo

provided two documents titled "Reallocation of AR-AP Balances." These were tri-party agreements among Akazoo, Smart Mobile, and third-party software companies where the third party essentially agreed to give up its claim against Old Akazoo for payment and instead accept a claim against Smart Mobile. Here is an example of one such agreement whereby a company called GP Solutions.com gives up its claim against Akazoo:

**REALLOCATION OF AR-AP BALANCES**

We, GP Solutions.com Ltd, have an open Trade Receivable from **Akazoo DWC-LLC** of total value 7.000.000,00 EUR as of 31/12/2018 with the following details:

| DATE | INVOICE | AMOUNT |
|------|---------|--------|
| 28/08/2018 | INV 169 | 1.981.250,00 € |
| 20/09/2018 | INV 176 | 1.850.360,00 € |
| 16/10/2018 | INV 184 | 971.200,00 € |
| 30/10/2018 | INV 192 | 882.260,00 € |
| 19/12/2018 | INV 197 | 1.314.930,00 € |

Hereby state that we transfer any and all of our claims regarding our Trade Receivable balance, for the amount of 6.906.340,79 EUR from **Akazoo DWC-LLC** to **Smart Mobile Communications PTE Ltd**

Accordingly, we hereby 6.906.340,79 release Akazoo DWC-LLC from repayment of 6.906.340,79 EUR of Trade Receivable balance, and we hereby acknowledge and accept **Smart Mobile Communications PTE Ltd** to record the amount of 6.906.340,79 EUR as an obligation/liability towards our company.

IBAN: EF73 0000 0093 2004 4255
Bank: TBB LTD
Beneficiary: GP Solutions.com Ltd
SWIFT: TABUEE22XXX

Date of Signature
December 31, 2018

One behalf of GP Solutions
Name:        Markus Schmit
Title        Marketing Director
Signature:

We, Smart Mobile Communications PTE Ltd, have an open Trade Payable to Akazoo DWC-LLC of total value 17.046.796,52 EUR as of 31/12/2018.

Hereby accept the transfer of GP Solutions.com Ltd's claim of 6.906.340,79 EUR with the following details:

| DATE | INVOICE | AMOUNT |
|------|---------|--------|
| 31/12/2018 | 2018/0027 | 3.417.585,06 € |
| 31/12/2018 | 2018/0028 | 3.488.755,73 € |

regarding our Trade Payable balance from **Akazoo DWC-LLC** to **GP Solutions.com Ltd** and we hereby state that, following such transfer of claim to our company, we hereby accept any and all of our liabilities in favor of **GP Solutions.com Ltd** regarding the payable balance of 6.906.340,79 EUR.

Accordingly, we hereby acknowledge and accept **GP Solutions.com Ltd** to record the amount of 6.906.340,79 EUR as Trade Receivable balance from our company.

Date of Signature
December 31, 2018

One behalf of Smart
Name:        John Chow
Title        Director
Signature:

We, Akazoo DWC-LLC, have an open Trade Payable balance towards **GP Solutions.com Ltd** of total value 7.000.000,00 EUR as of 31/12/2018, with the following details

| DATE | INVOICE | AMOUNT |
|------|---------|--------|
| 28/08/2018 | INV 169 | 1.981.250,00 € |
| 20/09/2018 | INV 176 | 1.850.360,00 € |
| 16/10/2018 | INV 184 | 971.200,00 € |
| 30/10/2018 | INV 192 | 882.260,00 € |
| 19/12/2018 | INV 197 | 1.314.930,00 € |

and an open Trade Receivable balance from **Smart Mobile Communications PTE Ltd** of total value 17.046.796,52 EUR as of 31/12/2018. We hereby accept the transfer of **GP Solutions.com Ltd** claim for the amount of 6.906.340,79 EUR of the Trade Payable balance from our company against our Trade Receivable balance with **Smart Mobile Communications PTE Ltd** and we state and acknowledge that following such transfer of claim, **Smart Mobile Communications PTE Ltd** is released from repayment of 6.906.340,79 EUR towards our company.

Date of Signature
December 31, 2018

One behalf of Akazoo DWC-LLC
Name:        Apostolos Zervos
Title        CEO
Signature:

An identical tri-party settlement arrangement, with identical documentation, was prepared for another software company called Diyomi Soft. These documents were

not only bizarre on their face, but the transactions and underlying documentation made no business sense.

65.    It is clear that Crowe made no effort to contact GP Solutions.com to determine if 1) the invoices were real or 2) whether GP Solutions.com, a company allegedly located in the British Virgin Islands, in fact agreed to completely release Akazoo and look only to Smart Mobile—an unknown company purportedly from Singapore—for payment.  This is clear because Crowe apparently misunderstood the identity of the counterparty.  The above clearly says the counterparty is named GP Solutions.com in bold language, "We, **GP Solutions.com Ltd**."  The underlying contract makes clear that GP Solutions.com is located in the British Virgin Islands:

This Custom Software Development Agreement (the "Agreement") is made and effective 29th June 2018

BETWEEN:        **AKAZOO CY** (the "Customer"), a corporation organized and existing under the laws of Cyprus, with its head office located at:

214 Arch. Makarios III, 3030, Limassol, Cyprus

AND:            **GP SOLUTIONS.COM LTD** (the "Developer"), a corporation organized and existing under the laws of British Virgin Islands, with its head office located at:

Quijano Chambrs, Road Town, PO BOX 3159, Tortola, British Virgin Islands

(emphasis added). There is no evidence such an entity actually existed.  Crowe apparently accepted, without inquiry and independent competent evidentiary matter, that the entity was real because there is a real software development company with a similar name.  Specifically, a company named GP Solutions is headquartered in

Munich, Germany that specializes in custom software development.[2]   Crowe described this legitimate GP Solutions as the counterparty to the above transaction in its 2018 Audit Findings Report ("2018 AFR"):

> ☐ GP Solutions are a European software development house focused on custom software development, IT consulting and support.  Their services include mobile application development. GP Solutions provided software development totalling €7m during FY18 covering a range of related

(emphasis added).   Crowe personnel were either incompetent beyond comprehension, or simply failed to read the underlying documentation to confirm the validity of any part of the tri-party "settlement" agreements.  In any event, it is obvious that Crowe made zero effort to contact GP Solutions to confirm the validity of this alleged agreement, nor did Crowe apply appropriate professional skepticism about the arrangement which makes zero business sense.  Why would a company owed nearly seven million Euros release Akazoo from all liability in return for a claim against anyone—let alone an entity so lacking in documentable substance as Smart Mobile?

66.    To offset the Aragona receivables, Old Akazoo provided documents purporting to show that Aragona "paid" more than €10 million in music content fees and server hosting expenses on behalf of Akazoo.  It is unclear what documentation

---

[2]       https://gpsolutions.com/

(if any) was provided to Crowe to substantiate the amount of the expenses, the release of liability, or the actual payment of the expenses.

67.   Smart Mobile and Aragona were not the only aggregators.   The confirmation received for Zed Media's receivable raised red flags too.   As noted above, Zed Media apparently ignored the original confirmation sent in late March 2019.   On May 20, 2019, however, Old Akazoo finally sent Crowe confirmations allegedly signed and returned from Zed Media on May 17.   Unlike with the Smart Mobile and Aragona documents, the Zed Media confirmation looks like a traditional confirmation that an auditor might send, albeit with a huge error (and of course setting aside the _fact_ that, contrary to required audit procedures and fundamental rules of auditing,   the client controlled the confirmation process instead of the auditor). Control of the process by the client specifically contradicts professional standard for obvious reasons and renders the whole confirmation process of no value for audit purposes.   In any event, the Zed Media "confirmation" was the original confirmation sent in late March, indicating that Zed owed Akazoo €19 million as of December 31, 2018; the Zed respondent crossed out that number and replaced it with €3,702,750.14—which was the amount incorporated into the revised general ledgers.   In other words, Old Akazoo had asked Zed Media to confirm the "wrong" balance, but after Akazoo fixed its own records, Zed confirmed a number that

matched the new records.  It is unclear if Crowe made any effort to directly contact Zed about the drastic change or to question Old Akazoo about the issue.

68.     The discrepancy with the Zed Media balance allegedly related to Old Akazoo's failure to account timely for another series of "settlement" agreements that reduced Zed Media's receivable. The primary such agreement involved a music content provider, One RPM, agreeing to release Akazoo of liability for €11 million worth of invoices Akazoo owed from June to December 2018.  As evidence for this arrangement, Crowe was provided another "Reallocation of AR-AP Balances" document signed by One RPM, Zed Media, and Akazoo—again allegedly done as of December 31, 2018, but actually created in late May 2019—and a series of invoices from One RPM to Old Akazoo for the second half of 2018.

69.     Once again, Crowe made no effort to contact or confirm with One RPM to inquire about the validity of this agreement or of the underlying invoices, which were suspect on their face.  Although One RPM is a real provider of digital music rights to streaming services and located in Nashville, the invoices listed as the address for One RPM *the exact same address* (same suite number even) in Belize City as listed for Zed Media on its invoices.  Moreover, the invoices merely instruct the recipient to pay "by check" without any account information—as if anyone would mail a check for millions of Euros to an address in Belize instead of wiring the money.  This is another clear and material example of an arrangement that any

competent auditor employing required professional skepticism would question. For what it is worth, a real company called Zed Group (similar in name only to the fictional Zed Media) engages in mobile phone marketing, but it is headquartered in Spain and has no offices in or connection to Belize.

70.    Crowe had no involvement whatsoever in preparing, requesting, or receiving these documents allegedly confirming the receivable balances and the "settlement" arrangements. The documents were simply provided by Akazoo to Crowe, purportedly signed by the third parties. The documents for Smart Mobile and Aragona did not even purport to be confirmations for audit purposes. In short, no reasonable, competent auditor would accept this documentation as acceptable confirmations of any balances or transactions—let alone the most significant revenues, expenses, and assets of the entity under audit.

71.    On May 27, 2019, facing a June 6 deadline, the Crowe audit partner in London, Nigel Bostock, apparently realized that Crowe's audit workpapers were a mess and the Company's explanations as to how it was doing business did not withstand even superficial scrutiny. In particular, Mr. Bostock appropriately noted that he struggled to understand all the offsets to the receivables, as he wrote to Paris:

**From:** Nigel Bostock <Nigel.Bostock@crowe.co.uk>
**Sent:** Δευτέρα, 27 Μαΐου 2019 8:39 μμ
**To:** Paris Triantafyllidis <p.triantafyllidis@akazoo.com>; Joanne Beckley
<Joanne.Beckley@crowe.co.uk>; Joel Gelderd <Joel.Gelderd@crowe.co.uk>
**Cc:** Pierre Schreuder <p.schreuder@akazoo.com>
**Subject:** RE: Akazoo Update

Thanks Paris

I am struggling to reconcile some of the debtor figures for Aragona, Zed and Smartmobile given the late adjustments made and various offsets.  Perhaps I can have a chat with Jo tomorrow and we can follow this up with you further.

Kind regards,

Nigel

**Nigel Bostock**
*Chief Executive*

As of June 5, 2019, Mr. Bostock's primary colleague on the audit in London—Joanne Beckley—wrote to Paris that Crowe was "still struggling" to close the audit due to lack of understanding "what the latest position is with the major aggregators":

| | |
|---|---|
| Subject: | RE: Akazoo - financial statements review |
| Date: | Wednesday, June 5, 2019 at 11:50:42 AM Central Daylight Time |
| From: | Joanne Beckley |
| To: | Nigel Bostock, Paris Triantafyllidis |
| CC: | Joel Gelderd |
| Attachments: | image005.png, image006.png, image007.png, image008.png, image009.gif, image010.png, image011.png, image012.png, image013.png, image014.jpg, image001.png, image002.png, 119060517504501599.jpg |

Hi Paris,

Thank you for providing the information below. The area I think we are still struggling to close is as follows:

- Information on off-setting debtor balances and cash received in the year

This includes understanding what the latest position is with the major aggregators, (post year end) whether any cash has been received/further set off agreements have been entered into.

If you could please provide us with some further information around this, that would be really helpful.

Many thanks,

Kind Regards,

**Jo Beckley**
Manager

72.     Apparently, Mr. Bostock and Ms. Beckley were concerned enough that they spoke with Paris on a call on June 6 to discuss the confirmations.  Plaintiffs at this time obviously don't know what was discussed other than that Mr. Bostock and Ms. Beckley insisted that the Company get actual "confirmations" from Smart Mobile and Aragona instead of the assortment of documents that the Company had thus far produced to support the balances.   Amazingly, Paris produced signed confirms _that evening_ from both the fictional Smart Mobile (purportedly located in Singapore) and the fictional Aragona (purportedly located in Cyprus), both multiple time zones away from Paris' location.  Crowe had zero involvement in preparing, sending, or receiving these confirmations.  They simply appeared nearly instantly on

demand from Paris' computer.  Crowe signed the 2018 Audit Report the next morning. Worse, it appears based on internal emails between Paris and Zervos in advance of the call that Paris explained the messy documentation by claiming Old Akazoo's finance department was stretched thin and busy with other matters, so the 2018 activity did not get recorded correctly during 2018 and into the first part of 2019.  As noted above, this explanation—that Old Akazoo was slow to record the transactions in its own books—makes no sense given that Smart Mobile and Aragona initially agreed the "wrong" balances were right.  Worse, this explanation should have set off alarm bells about all of Old Akazoo's financial reporting; instead, Crowe signed its audit report the next morning.

73.    In addition to the above, Crowe knew that the notes to the financial statements, which were prepared by management, were misleading.  This alone should have been yet another a massive red flag.  But not only did Crowe ignore this fact, Crowe allowed these inconsistent footnotes to be published as part of the audited financial statements.

74.    Most conspicuously, note 17 discussed Old Akazoo's exposure to financial instruments—by far the largest such instrument listed was the trade receivables owed by the (fake) aggregators.  This discussion is riddled with false statements that Crowe knew were false:

### 17.   FINANCIAL INSTRUMENTS

In common with other businesses, the Group is exposed to the risk that arises from its use of financial instruments. This note describes the Group's objectives, policies and processes for managing those risks and the methods used to measure them. Further quantitative information is found throughout these consolidated financial statements.

**Financial instruments recognised in the consolidated statement of financial position**

All financial instruments are recognised initially at their fair value and subsequently measured at amortised cost:

| | | Group |
|---|---|---|
| | 2018 | 2017 |
| In € thousand | € | € |
| **Loans and receivables:** | | |
| Cash and cash equivalents | 501 | 2,107 |
| Trade and other receivables | 34,683 | 31,343 |
| | 35,184 | 33,449 |
| **Other financial liabilities:** | | |
| Borrowings- Convertible loan notes | 2,317 | — |
| Trade and other payables | 16,002 | 15,539 |
| | 18,318 | 15,539 |

**Fair values of financial assets and liabilities.**

The fair value of trade debtors and creditors included in net current assets is equivalent to the balance sheet carrying values. Borrowings are held at amortised cost.

**Financial risk management objectives and policies**

**Credit risk**

As of balance sheet date there were no significant concentrations of credit risk. The Group's exposure to credit risk arises mainly from counterparty's failure to meet its obligation to settle a financial asset. Analysis of the trade receivables past due is disclosed in note 10 and analysis of trade and other receivables by foreign currency exposure is noted below. The Directors consider the Group's exposure to credit risk arising from trade receivables to be minimal. Credit risk arising from other receivables is controlled through monitoring procedures, including credit approvals and credit limits, with the balance largely offset by separate liabilities held on the balance sheet relating to the same party

The Group relies on the expertise of large third-party service providers for payment processing and aggregation services, including for direct carrier billing and the processing of credit and debit cards. Receivable balances are reconciled regularly to ensure that the risk of exposure to bad debts is minimized and balances due are settled within months of arising.

(emphasis added).

75.     The assertion that Akazoo faced "no significant concentrations of credit risk"[3] is patently false:  €28 million of the €34 million (82%) of the trade receivable was owed by three aggregators—actually, Smart Mobile and Aragona alone allegedly owed €25 million.   This misrepresentation is especially significant considering that Akazoo had very little cash on hand (or borrowing facilities); the trade receivables were essentially Akazoo's only lifeline *for* cash if needed, so the

---

[3]     The Old Akazoo financial statements were prepared purportedly in accord with the International Financial Reporting Standards, which require disclosure of material concentration risks.

risk that an aggregator failed to pay was material.  Crowe failed to take any steps to contact the aggregators or any third party to verify their existence, let alone apply any audit procedures to evaluate and document their creditworthiness or test their internal controls.  As part of its audit procedures, Crowe should have at the very least requested that Old Akazoo management provide Crowe with its analysis of the creditworthiness of its counterparties and then Crowe should have made appropriate inquiries and evaluated that analysis through its own audit procedures which may include, especially considering the materiality of the relationships and their impact on the Company's financial position and its own independent investigation.

76.    The footnote contains a reference of sorts to the aggregators—the only such reference in the financial statements—saying the company "relies" on "large third-party service providers" for "aggregation services."   Crowe knew this reference is misleading at best.  The note does not say that the Company relies almost exclusively on such entities for all of the Company's financial transactions.  The note calls such entities "large," which is a ridiculous representation given that Crowe knew nothing about these entities except that they had zero presence on the internet, and for all Crowe knew, apparently had maybe one employee each and for which Crowe had performed no audit procedures.  Worse, the footnote describes the service provided by these entities as simply payment processing when as far as Crowe knew these entities purportedly did everything from marketing to customer acquisition to

accepting liability for payment and purportedly being responsible for paying Old Akazoo's bills.

77.    Finally, the last sentence claims that "receivable balances are reconciled regularly" and "balances due are settled within months."  In fact, Crowe absolutely <u>knew</u> that Old Akazoo and the aggregators had failed to reconcile the balances for many months and as a result, its financial records failed to capture activity for <u>half of 2018</u>.  Moreover, Crowe knew the balances were not settled within months.  Many of the balances still outstanding as of June 2019 related to invoices purportedly for activity from July 2018.  In fact, before Crowe signed its audit report on June 7, 2019, Crowe obtained a representation from Old Akazoo management that receivable balances from the second half of 2018 would finally be settled completely with new costs incurred by Akazoo and paid by the aggregators during the first half of 2019.  And even that representation, if true, still should have been challenged, as it would have left Old Akazoo with minimal cash for its operations.

78.    Without belaboring the point, the notes contain other misrepresentations.  For example, the notes claim that the Company's "normal trade credit terms" for trade receivables was 60 days when the overwhelming majority of trade receivables, which were owed by the aggregators, were not paid for many months—almost a year in some cases—and, when paid, were paid via a liability

"settlement" (which is, on its face, and without appropriate audit investigation, not believable). Although this note indicates that 9% of such receivables are more than 90 days past due, the figure grossly understates the "truth." Crowe obviously knew this but allowed the false representation to be made in the financial statements it purportedly audited.

79.    Another example of outright misstatements in the financial statements can be found in the footnote describing the company's outsized intangible asset. The note explains the asset largely consists of investments in purchased software as opposed to investments in software under development; purchased software can be amortized (software under development cannot) and also is more valuable since it is presumably proven, functioning software. The note shows that during 2018, the Company added €11 million in software investment of which €10 million was for purchased software (and almost none identified as software under development):

**8.   INTANGIBLE ASSETS**

Group

| In € thousand COST | Patents & Licenses € | Purchased Software € | Internally generated software € | Software under development € | Totals € |
|---|---|---|---|---|---|
| At 1 January 2018 | 2,828 | 22,109 | 4,195 | 558 | 29,690 |
| Additions | — | 10,437 | 646 | 285 | 11,365 |
| Exchange differences | 90 | | (21) | 4 | 73 |
| At 31 December 2018 | 2,918 | 32,546 | 4,820 | 848 | 41,128 |
| **AMORTISATION** | | | | | |
| At 1 January 2018 | 1,533 | 6,130 | 740 | | 8,403 |
| Amortisation for year | 142 | 3,549 | 1,405 | — | 5,096 |
| Exchange differences | 60 | | (12) | | 48 |
| At 31 December 2018 | 1,735 | 9,679 | 2,133 | | 13,546 |
| **NET BOOK VALUE** | | | | | |
| At 31 December 2018 | 1,183 | 22,867 | 2,687 | 848 | 27,582 |
| At 31 December 2017 | 1,295 | 15,979 | 3,455 | 558 | 21,287 |

(emphasis added).

80.    This representation is patently false.  The proof comes from Crowe itself.  After the 2018 Audit was completed, Crowe prepared its 2018 AFR that provided detail on the audit findings.  In the 2018 AFR, Crowe acknowledged that all of the €10 million in additions during 2018 were for software development. (These "investments" were made via the "settlement agreements" among Akazoo, Smart Mobile, and two software companies—GP Solutions and Diyomi Soft.).  After it signed off on the financial statements including the note quoted above, Crowe wrote the following in the AFR presented to Old Akazoo management only:

- For the Dubai additions of software totalling €10m, a large sample of the main additions have been agreed back to additions from the software developers as follows:
  □ Diyomi Soft Malta Limited are a business who specialise in innovative web-based iT solutions which include mobile application development and reference both 'Akazoo chat' and a testimonial from Panagiotis Dimitropolous (InternetQ) on their website.  Diyomi have provided software development fees totalling €3m covering (i) User Segmentation Engine (€820k), Orchestration Platfrom System Development - 10 Country Deployment (€1.35m) and Album Deduplication Repository Analysis/Norm Software (€830k).  Details of how the liability for the purchase of this software was settled in part by a tri-partite agreement is outlined within the recovery of trade receivables section.  This software has not been amortised at the year end due to it still being in development.
  □ GP Solutions are a European software development house focused on custom software development, IT consulting and support.  Their services include mobile application development. GP Solutions provided software development totalling €7m during FY18 covering a range of related services including trending data aggregation modules for content recommendations and search, user profiling analysis, messaging broadcaster, DB cluster logic for trending data, user demographic analysis platform, stat processing system, mobile client real time transcode (radio), billing reporting modules and analytics including credit card processing, and, compliance submodule.  Details of how the liability for the purchase of this software was settled in part by a tri-partite agreement is outlined within the recovery of trade receivables section.  This software has not been amortised at the year end due to it still being in development.

(emphasis added).  The 2018 AFR's characterization is correct as to Crowe's understanding; Crowe's failure to reconcile its understanding of what software the Company was supposedly purchasing with the contradictory portrayal of that

software in the financial statements illustrates Crowe's utter disregard for the accuracy of those statements when issuing its Audit Report.

**V.    Crowe's 2018 Audit Is Disclosed to Investors.**

81.    On June 7, 2019, Crowe released its audit report on Old Akazoo's 2018 Financial Statements ("2018 Audited Financial Statements").   On June 10, 2019, MMAC, Old Akazoo, and MMACSA filed a revised Proxy and Registration Statement ("June Proxy").   Crowe was provided with drafts of the June Proxy and invited to make comments.

82.    The June Proxy contains the same misleading description of Old Akazoo's business as in the February Proxy, omitting any mention of the role played by the aggregators as portrayed to Crowe by Old Akazoo management.  The primary change in the June Proxy was the addition of Crowe's audit report and the associated 2018 financial statements.

83.    Crowe separately signed and filed with the SEC a consent to the inclusion of its Audit Report on the 2016-2018 audited financial statements in the Proxy so Crowe was fully aware that investors in MMAC and MMACSA and the PIPE investors would rely its audit work and in particular on its Audit Report and the associated financial statements in making their investment decisions.  Crowe also knew that these filings were designed to facilitate trading in Akazoo stock on the Nasdaq headquartered in New York.  Moreover, in mid-May, as Crowe restarted the

audit work, Old Akazoo management told Crowe: "Aim would be to know that our numbers are final as soon as possible next week (hoping Monday) to (a) incorporate them in the F4 [June Proxy] and (b) market them to investors early next week (Monday if possible) because that US marketing plan needs to go live Monday." The referenced "US marketing plan" was the effort to raise the PIPE financing.  In short, Crowe knew that its audit work and in particular its audit report was going to be used by the Company as its imprimatur to raise money from investors, included in marketing efforts, and hence investors like the Plaintiffs would rely on the results of the audits and the audit report and associated financial statements in making investment decisions.

84.    Crowe knew that the June Proxy was designed to serve two purposes. First, Crowe knew that the filing was required to obtain the approval of the merger from existing MMAC shareholders.  Second, Crowe knew that a substantial portion of MMAC shareholders either had redeemed or would redeem, and thus MMAC was in the process of putting together a PIPE offering.

85.    Crowe represented in its Audit Report dated June 7, 2019:

**Opinion on the Financial Statements**

We have audited the accompanying consolidated statement of financial position of Akazoo Limited (the "Company") and its subsidiaries (together with the Company, the "Group") as of December 31, 2018, 2017 and 2016 and the related consolidated statements of profit or loss and other comprehensive income, changes in equity and cash flows for each of the three years in the period ended December 31, 2018, 2017 and 2016 and the related

notes numbered 1 to 21 (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the consolidated financial position of the Group as of December 31, 2018, 2017 and 2016 and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2018, 2017 and 2016 in conformity with International Financial Reporting Standards, as adopted in the European Union.

**Basis of Opinion**

\*      \*      \*

We conducted our audits in accordance with International Standards on Auditing (UK) (ISAs (UK)) and the standards of the Public Company Accounting Oversight Board (United States). . . . Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks.  Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements.  We believe that our audits provide a reasonable basis for our opinion.

We have served as the Company's auditor since 2015.

## VI.   Crowe's 2018 Audit Report Was False and Misleading.

86.    Crowe's 2018 Audit Report was false and misleading in two obvious respects.  First, as outlined below, contrary to its representation, Crowe did not conduct its audits in accordance with the relevant professional standards governing such audits as it was required to do and specifically claimed to have done in their Audit Report.  Second, the audited financial statements did not "present fairly, in all material respects, the consolidated financial position of" Old Akazoo.  To the

contrary, almost every figure in the audited financial statements were false.  As outlined below, Crowe knew or should have known this fact, and most certainly <u>would</u> have known this fact if it had followed the required audit procedures it professed to be following and exercised professional skepticism, as it was required to do.  Second, as outlined above, as Crowe knew, the financial statement notes contained affirmative misstatements, so Crowe knew that the financial statements did not "fairly present" Akazoo's financial condition.  And further, Crowe knew that the various descriptions of the Old Akazoo business and operations in the Company's financial statements and SEC filings were wholly inconsistent with Crowe's own understanding of the Company's business and operations.

### A.    Crowe Did Not Follow PCAOB Audit Standards.

87.    Crowe's representation that it conducted the "audits in accordance with International Standards on Auditing (UK) (ISAs (UK)) and the standards of the Public Company Accounting Oversight Board (United States)" was false.  Similarly, Crowe's representation that the audit "included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks" was also false.

88.    Public Company Accounting Oversight Board standards ("PCAOB Standards") require that a registered accounting firm such as Crowe comply with applicable auditing and related professional practice standards.  (PCAOB Rule

3100.) The PCAOB auditing standards are codified in a topical structure referred to simply as "Auditing Standards" ("AS") and use a four-digit numbering system.  In order to issue an unqualified opinion concerning Old Akazoo's financial statements, Crowe was required to perform an audit in accordance with PCAOB standards and base its opinion on that audit.  (AS 3101.02.)  PCAOB standards require, among other things, that Crowe plan and perform the audit with due professional care, including the exercise of professional skepticism (AS 1015.01 and .07), and that it obtain sufficient appropriate audit evidence to provide a reasonable basis for the unqualified opinion it expressed in the Audit Report (AS 1105.04).   The International Standards on Auditing (UK) ("ISA Standards") contain similar requirements.

89.    Crowe's most obvious failure was in not following proper procedures to confirm the validity of the transactions with the aggregators.  That flaw was fatal to its audit because the purported aggregators handled essentially all materials aspects of Old Akazoo's financial transactions.   Given this failure—even if everything else was performed consistent with professional standards (which it was not)—no proper audit conclusion could be drawn about the associated financial statements.  As noted, Old Akazoo's largest asset was alleged receivables owed by three aggregators.  Under the PCAOB standards, there is a "presumption that the auditor will request the confirmation of accounts receivable during an audit." (AS

2310.34.)  The standards are clear that an auditor must "maintain control" over the confirmation process which in turn is defined as "establishing **direct communication** between the intended recipient and the auditor" to minimize the possibility of fraud.  (AS 2310.28, emphasis added).  Crowe completely abdicated the confirmation process to Old Akazoo management and had no direct communication with the aggregators.  This audit defect alone invalidated Crowe's ability to render any audit report—let alone the "clean" one they ultimately authored.

90.    Even if Crowe had sent the confirmations directly by email to the aggregators, this would not have been sufficient.  AS 2310.29 warns that certain forms of confirmation should not be treated as valid audit evidence without more because of "the difficulty of ascertaining the sources of the responses."  While AS 2310.29 mentions as an example, facsimile confirmations, email communication to a single email address supplied by the client is even more susceptible to fraud.  ISA Standard 505.A12 instructs auditors relying on electronic confirmation to "incorporate various techniques for validating the identity of a sender of information in electronic form, for example, through the use of encryption, electronic digital signatures, and procedures to verify web site authenticity."

91.    Further, Crowe's reliance on confirmations which were sent to a single email address without more—such as any additional contact information or any effort by Crowe to communicate directly with the aggregators—was a telltale sign

of potential fraud.  Crowe—which apparently had no contact information for the aggregators aside from a single email address provided by management—could find no evidence of the aggregators when searching the internet.  Both relevant sets of auditing standards contain multiple rules prohibiting auditors from relying on confirmations where such risk of fraud exists.

92.     The aggregators were what auditors refer to as "service organizations," *i.e.*, entities that provide services to a user organization (here Old Akazoo) and which are part of the user organization's information system.  (AS 2601.02).  The services that the aggregators (the service organizations) provided to Old Akazoo (the user organization) were part of Akazoo's information system because the aggregators purportedly initiated, recorded, and processed Akazoo's revenue, receivable collection, and major expenditure transactions and reported the results to Old Akazoo in monthly reports to include in Old Akazoo's accounting records and financial statements.  (AS 2601.02).

93.     PCAOB standards therefore required Crowe to consider the effect of the aggregators' activities in planning and performing the audits.  (AS 2601.06). Crowe was required to obtain an understanding of the internal controls at the aggregators over the accuracy and completeness of the information provided to Old Akazoo and design substantive tests to detect potential misstatements.  (AS 2601.07).  Crowe did not obtain sufficient appropriate evidence concerning the

aggregators' controls relevant to Old Akazoo's material account balances related to revenues, receivables, and major expenditures. As a result, Crowe did not design and implement audit procedures that addressed the risks of material misstatement in those Old Akazoo accounts as required by PCAOB standards. (AS 2301.03).[4]

94.   Crowe's conduct is more shocking given the significance of the transactions to Old Akazoo's financial position and its financial statements, the unusual nature of the transactions, the transactions' complexity, and the lack of segregation of duties related to essentially all material transactions. Auditing Standards 2310.07-.09 and 2301.09 essentially require an auditor to demand more persuasive evidence where transactions are especially material, unusual, complex, or involve increased risks of material misstatement. All of these factors applied to the transactions with the aggregators. Even Crowe—when summarizing its audit work—acknowledged that the top three "key areas of audit risk and focus" were the three financial metrics that reflected almost entirely transactions with the aggregators. Yet, Crowe did nothing to verify whether the transactions with the aggregators that created over 94% of the revenue, 90% of the trade receivables, and all of the increase in intangible assets during 2018 were real.

---

[4]   Large third-party servicers—which the aggregators supposedly were—usually engage an independent audit firm to test their internal controls and issue a report thereon (called an SSAE18 report). That report would then be made available to their customers and their customers' auditors for their reliance in considering the third-party's controls. Crowe did not request such a report, did not receive one, and did not perform any such audit work on its own.

95.     Additionally, Plaintiffs have found *zero* evidence that Crowe sought to confirm the validity of the alleged tri-party "settlement agreements" by confirming the terms with the third-party vendor (*e.g.*, the computer software company or One RPM).   The validity of these settlement agreements were part and parcel of determining the receivable balances.  Crowe's own Audit Findings Report given to Old Akazoo management post-audit said that understanding these settlement agreements was "critical to understand the movement in receivables during the year."   As a result, the presumption requiring confirmation of receivables applied such that Crowe was required to seek confirmation from the third parties about the validity of these alleged agreements.  Even if the presumption did not apply, PCAOB standards regarding confirmation apply to obtaining evidence about any "financial statement assertions made by management." (AS 2310.11) Given the unusual nature of these arrangements—and especially given that, as written, they made no business sense—Crowe had to obtain a thorough understanding of the agreements and confirm that understanding.  (AS 2310.25.)  There is no evidence Crowe made any effort at all to confirm the agreements.

96.     Crowe failed to exercise due professional care, failed to exercise professional skepticism, and failed to obtain sufficient appropriate evidence on which to base its Audit Report.  Both Crowe's risk assessment and its response to those risks failed to comply with PCAOB standards.  PCAOB standards required

Crowe to perform risk assessment procedures sufficient to provide a reasonable basis for identifying risks of material misstatement whether due to error or fraud. (AS 2110.04). They also required Crowe to perform risk assessment analytical procedures relating to revenue with the objective of identifying any unusual or unexpected relationships involving revenue accounts that might indicate a material misstatement, including a material misstatement due to fraud. (AS 2110.47.) Professional skepticism requires an attitude that includes a questioning mind and a critical assessment of audit evidence. (AS 1015.07.)

97.    PCAOB standards required Crowe to presume the existence of a fraud risk involving improper revenue recognition and to evaluate the types of revenue, revenue transactions, or assertions that may give rise to such risks (AS2110.68). Crowe failed to identify and respond adequately to the risks of material misstatement in Old Akazoo's financial statements arising out of the exact type of fraud that actually occurred.

98.    Crowe was required to design and perform audit procedures that addressed the fraud risk of improper revenue recognition and the specific risk of material overstatement of revenue and revenue-related costs. (AS 2301.08-09, .13.) Crowe was required to perform substantive procedures for the financial-statement assertions of the occurrence (bona fides) of revenue and existence (bona fides) of trade receivables. (AS 2301.36.) Crowe's audit procedures fell woefully short of

these requirements and failed to address the specific fraud risks of improper revenue recognition described above.

99.    Among the most damning pieces of evidence of Crowe's utter disregard of its duty to exercise professional skepticism is Crowe's failure to make more searching inquiries regarding the aggregators, especially in light of many red flags raising questions about their actual existence.  As illustrated above and as described in further detail below, Crowe also was aware that Old Akazoo was a prime candidate for potential fraud, and yet Crowe failed to plan and execute its audit in keeping with that knowledge.  To begin with, Crowe knew that the accounting function at Old Akazoo was "understaffed" and decentralized—the purported CFO resided in London but the accounting staff and finance function was conducted in Athens.  (In fact, Crowe did not compare Old Akazoo's revenue per employee to that ratio for competitors—if it had, it would have found that Old Akazoo's ratio was significantly higher and indicative of heightened fraud risk.)  Worse, based on the documents Plaintiffs have reviewed concerning communications between Crowe and Old Akazoo, it appears that during the 2018 audit, Crowe did not communicate at all with the purported CFO, Pierre Schreuder.  Instead, Crowe communicated with low level accounting personnel in Greece, and Paris, the former CFO who had been replaced in August 2018, but apparently worked on the side for Old Akazoo.  The fact that the actual CFO appeared cut out of financial issues should have raised

significant concern.   (In fact, Mr. Schreuder has claimed that he was only the "nominal" CFO and was cut out of the details of most financial accounting issues.) Crowe knew that Old Akazoo had a lack of segregation of duties, unclear lines of authority and responsibility, and no internal audit department, and that Old Akazoo relied completely on third party service providers with no oversight—each indicative of an extremely ineffective and weak, if not non-existent, control environment, and which, taken together, presented a high risk of material misstatement requiring Crowe to undertake extended substantive audit procedures, which it utterly failed to do.

100.   Crowe also was told that Old Akazoo's internal accounting staff was unable to timely record transactions; Crowe was told that the staff apparently omitted many months of transactions in 2018, and thus the initial general ledgers were materially inaccurate for months even after the 2018 year-end.  Crowe knew this was a red flag of potential fraud.  Crowe's report to management about the audit lists purported steps Crowe took to detect fraud.  Included in the list is that "[t]he general ledger and accounts have been reviewed for any unusual activity post year end." This statement is patently false—Crowe knew that tens of millions of Euros in activity were added to the 2018 general ledgers after yead end.  Apparently, Crowe was so unconcerned about potential fraud that it did not even accurately record the steps it took to detect fraud.

101.   Crowe was also well aware of the increased risk of fraudulent financial reporting by Old Akazoo arising from management override of controls.  PCAOB auditing standards require Crowe to recognize the existence of this risk and design and perform audit procedures to address that risk.  (AS 2401.08 and .57-.67A.) Indeed, Crowe identified in its 2017 and 2018 AFRs a "significant" risk that "there could be an override of controls causing material misstatements to the financial results and/or performance of the business." Crowe further explained that it determined that risk was significant because of a "[d]esire to eliminate significant volatility in results and/or achieve/report results/financial position given current plans for the business."

102.   The risk of management override of controls exacerbated the already-significant risk of fraudulent financial revenue recognition.  Yet Crowe failed to perform procedures adequate to address these risks.  PCAOB standards required Crowe to perform three groups of procedures specifically to address the risk of management override.  Crowe purportedly examined one of the three—the "areas of critical accounting estimate and judg[]ment"—and did not identify "any undue areas of concern."  PCAOB auditing standards required Crowe to perform other/additional procedures in addition to reviewing accounting estimates.  In particular, they required Crowe to design and perform procedures to obtain an understanding of the business purposes (or lack thereof) of each significant unusual transaction to

evaluate whether the transaction was entered into in order to engage in fraud.  (AS 2401.66-.67A.)

103.   Crowe also failed to identify and assess the significant risks of material misstatement due to fraud arising out of the manner in which Old Akazoo recognized revenue.

104.   Crowe also knew that under accounting standards applicable to service companies such as a music streaming service, "subscription services revenue is recognized in the period in which the customer receives and consumes the benefit of the . . . services." (IFRS 15.) Crowe was aware that Old Akazoo's revenue was predominantly derived through the contractual arrangements with purported aggregators, rather than being derived directly from end-user customers receiving and consuming the streaming music service.  This revenue structure increased significantly the risks of revenue-recognition fraud at Old Akazoo because there was no reliable evidence in Old Akazoo's records of actual delivery of services to end user customers.

105.  Old Akazoo's purported arrangements with the aggregators also destroyed the accountability relationships in the Company's revenue cycle.  In short, Old Akazoo's purported contractual arrangements with the aggregators dismantled the traditional relationship between sales, trade accounts receivables, and collections of receivables. Instead, aggregators purportedly reduced collections paid Old

Akazoo by offsets for certain of Old Akazoo's costs.   These arrangements dramatically increased the risk of fraud and material overstatement of both revenues and costs.   This risk was increased further by tri-partite arrangements in which collections could also be offset by payments ostensibly made to third parties by aggregators for payables allegedly owed to those third parties by Old Akazoo.

106.   The tri-partite settlements were significant unusual transactions that demanded careful auditor consideration due to their overly complex and very unusual nature and their significant size.  (AS 2401.67.)  For example, in 2018, Old Akazoo ostensibly added €10 million of software in Dubai. Instead of paying the purported software developers directly, the purported payables to those developers were funded by aggregators through an offset to receivables from two aggregators. These transactions were simply movements in entries within Old Akazoo's ledgers, subject to the ability of management to manipulate these entries as described in PCAOB auditing standards. (AS 2401.08 and .57.)   Through this arrangement, management could move the fraudulent overstatement of revenue from trade receivables from the aggregators to other assets and thereby eliminate the need to show cash activity related to trade receivables.

107.   PCAOB standards required Crowe to design and perform procedures to evaluate the business purpose (or lack thereof) of such transactions, for example, by obtaining and evaluating evidence concerning the financial capability of the

aggregators. (AS 2401.66A-.67.) Such investigation, such as calling the aggregators or doing a quick internet search (which apparently Crowe did and found no reference to such entities), would have revealed that the aggregators either did not exist or had no relationship whatsoever with Old Akazoo. Without any understanding of the financial capabilities of the fake aggregators, Crowe should never have accepted, even initially, the veracity of the tri-partite agreements.

### a. The Financial Statements Did Not "Present Fairly, in All Material Respects, the Consolidated Financial Position of" Old Akazoo.

108. Obviously, Old Akazoo's financial statements did not "[p]resent fairly, in all material respects, the consolidated financial position of" Old Akazoo because every number reported therein was false. Crowe—at a minimum—acted with reckless disregard for the truth when making this representation. Worse, the notes to the financial statements made representations that Crowe knew were false according to their understanding of the (fictional) business of Old Akazoo, including disclosures regarding the lack of any credit risk and recognition of intangible assets. *See supra* at ¶¶ 75-80.

## VII. PIPE Investors Rely on 2018 Audit.

109. As is typical in SPACs, many of the existing investors in MMAC were expected to redeem their investment, leaving MMAC needing funds to complete the subject merger. As a result, MMAC and Old Akazoo amended the Merger Agreement to provide that MMAC would raise the additional capital required to

close the transaction via a PIPE offering.  MMAC began this PIPE fundraising effort

in May 2019 and it continued until August 2019.

110.   To facilitate this investment, MMAC and Old Akazoo caused New

Akazoo to file an amended Proxy and Registration Statement, Amendment No. 3,

with SEC on July 29, 2019 ("July Proxy")—which was made public on July 30.

Crowe reviewed the drafts of the July Proxy, and on July 25, Nigel Bostock informed

the company and its lawyers that Crowe had reviewed the document and had no

changes.  The July Proxy disclosed that because MMAC only had $14.7 million in

cash remaining after a recent wave of redemptions, New Akazoo was in the process

of securing at least $40 million from PIPE Investors.  Because a PIPE investment is

a private offering, the scope and scale of potential investors is limited; Crowe knew

this.

111.   The PIPE Investors invested in MMASA (ultimately Akazoo) pursuant

to a subscription agreement ("Subscription Agreement") between each PIPE

Investor and MMASA—each Subscription Agreement lists as the address for

MMASA an address in Atlanta, Georgia.  The PIPE Investors entered into the

Subscription Agreements between approximately July 2019 and September 10,

2019.  Pursuant to the Subscription Agreement, the PIPE Investors acquired "units"

from MMACSA; each "unit" entitled an investor to receive 1.24 common shares of

MMACSA once its stock started trading on the public market and, for some large

investors, a warrant to acquire additional shares.  The Subscription Agreements provided for closing of the transaction at the time the merger between MMAC and Old Akazoo closed.

112.  The Subscription Agreements signed by each PIPE Investor incorporated and attached the July Proxy, including Crowe's Audit Report.  While the Subscription Agreements were signed throughout August and into early September, the Agreements did not close until the merger between MMAC and Old Akazoo closed on September 11, 2019.

**VIII.  MMAC Shareholders Rely on Crowe Audit.**

113.  On August 12, 2019, MMAC, Old Akazoo, and MMASA filed the final Proxy and Registration Statement ("August Proxy") before the merger was approved.  The August Proxy was filed to obtain approval of the merger from existing MMAC shareholders at a shareholder meeting on August 28, 2019.  The August Proxy contained the exact same disclosures as the June and July Proxies, including the Crowe 2018 Audit Report.  On August 28, those Plaintiffs who were existing MMAC shareholders voted (in reliance on the 2018 Audit Report) to approve the merger and exchange their MMAC stock for New Akazoo stock.

**IX.  Crowe Speaks Directly to the PIPE Investors.**

114.  In late August 2019, the PIPE Investors grew concerned about the transaction because a prospective investor (who ultimately decided to pass on the

investment) raised a series of questions about Old Akazoo's business and finances. To get the questions answered, one of the placement agents for the PIPE Investors asked to speak directly to Crowe.

115.   The call took place on August 29, 2019.   The representative of the prospective PIPE investors was Greg Kennedy; Mr. Kennedy was located in New York City when the conversation occurred.   Crowe knew that Mr. Kennedy was calling on behalf of the prospective PIPE investors—in fact, during the call, a discussion ensued about Old Akazoo's solvency and Crowe explained why Old Akazoo needed the PIPE investment.   Crowe also was told the call was part of the PIPE investors' due diligence before the merger closed, which a condition precedent to the PIPE investment closing.

116.   During the call, Crowe's lead audit partner, Nigel Bostock, assured Mr. Kennedy that Crowe had thoroughly scrutinized the revenue coming out of Dubai and Cypress, as well as other material revenue.   Unbeknownst to Mr. Kennedy, the purported reason that Old Akazoo generated such a large percentage of its revenue from these two jurisdictions is that the Old Akazoo subsidiaries in those jurisdictions allegedly had contractual relationships with key aggregators and thus a critical issue in evaluating the Dubai and Cypress revenues was an assessment of the aggregators. During the call, Crowe never mentioned the aggregators, much less the minimal

efforts Crowe had undertaken to verify the existence of the aggregators and the purported revenue attributed to them.

117.   Notably, there was no one from Old Akazoo on the call—just Crowe presenting to a representative of potential U.S.-based PIPE investors.   In other words, Crowe essentially acted as a spokesperson for Old Akazoo.

## X.   Crowe Communicates with RSM.

118.   As noted above, before MMAC signed the Merger Agreement with Old Akazoo, Crowe conducted two calls with RSM, who was conducting due diligence on behalf of MMAC and its investors.   In late August 2019, as the merger was on the verge of closing, RSM was re-engaged to conduct a roll-forward of their prior due diligence before closing.   RSM asked numerous questions of Old Akazoo.   To respond, Old Akazoo management asked Crowe for a copy of a detailed report that Crowe had prepared after concluding the 2018 Audit (the 2018 AFR).   Old Akazoo management asked for a version of the 2018 AFR that could be edited; Crowe provided it but also asked that management share the edited version with Crowe before sharing with RSM.   A few days later, Old Akazoo—with Crowe's consent— shared a heavily edited version of the 2018 AFR ("2018 Revised AFR") with RSM.

119.   The 2018 Revised AFR omitted the names of all aggregators.   Old Akazoo management claimed that the names of the aggregators were somehow a business secret; Crowe knew or should have known this explanation made no

sense—there is no plausible reason why the mere names of the aggregators would be a secret and, in any event, RSM had signed a non-disclosure agreement with Old Akazoo.  Obviously, if RSM had the names of the aggregators, RSM could have done basic due diligence to determine if the aggregators were legitimate and/or credible.  The 2018 Revised AFR also removed numerous slides that would have alerted RSM more directly to the suspicious patten in which Old Akazoo's third-party expenses were offset against receivables via a purported settlement process with the aggregators.

120.   After receiving the 2018 Revised AFR, RSM sent Old Akazoo a series of questions that would be answered on another call on September 6, 2019 among RSM, Old Akazoo management, and Crowe.  This call was scheduled just days before the merger was set to close.  RSM participated in the call from New York City.  Old Akazoo management prepared proposed answers that were sent to Crowe. The proposed answers transparently were designed to deceive.  For example, RSM asked "[w]hich 'few major clients' did the Company generate significant revenue with in 2018?"  Old Akazoo management's answer was "A mix of members of well know[n] direct billing carrier groups + direct commercial relationships."  This was completely false and, at least as importantly, was wholly inconsistent with what Crowe understood to be the operating scheme of Old Akazoo.  Akazoo had no relationships with direct billing carrier groups (much less "well-known" ones) or

direct commercial relationships.  As far as Crowe "knew," Old Akazoo generated almost all of its revenue from relationships with a few "aggregators"; worse, Crowe knew the obscure names of these aggregators and thus knew or certainly should have known as a byproduct of their purported audit work, that the aggregators hardly were "well-known."  RSM also asked, "[i]t appears this information [information about the "few major clients"] was excluded from the 2018 AFR.  What else was excluded from the 2018 AFR?"  Old Akazoo management proposed that Crowe would inform RSM that only the names of third-parties "have been omitted due to it being commercial sensitive" when it fact much more (9-pages of information in total) had been omitted.  Worse, in light of the apparent edits, RSM asked, "[h]as Management assisted with the drafting of the 2018 AFR?"  Old Akazoo management's proposed response was, "NO."  Of course, just days before, Crowe had provided management with an editable version of the original 2018 AFR so that management could make edits before providing to RSM.  At a minimum, the fact that Old Akazoo management was proposing to provide such completely dishonest responses was yet another in a long list of glaring red flags for Crowe that management was engaged in a fraud.  Worse, there is no evidence that Crowe protested providing these responses including the overall obviously false "NO" regarding management's involvement in the edited AFR.  Crowe knew these answers were not true and would likely deceive potential investors, yet went along with the charade.

121.   On September 11, 2019, the MMAC-Old Akazoo merger closed.  At that point, the PIPE Investors acquired securities in MMACSA, which was renamed Akazoo.

**XI.    Crowe Owed Plaintiffs a Duty of Care.**

122.   As detailed above, Crowe acted—at a minimum—negligently in conducting its audit and making the representations in the 2018 Audit Report and when it spoke directly to representatives of the PIPE Investors and MMAC.  Crowe had a duty to speak with care because it was foreseeable that Plaintiffs would rely on Crowe's audit work and other representations.  Alternatively, Crowe owed a duty of care because (1) Crowe was aware that its financial reports, including the 2017 Revised AFR, the 2018 Revised AFR, the 2016-2018 Audit Reports, and its various telephone calls with RSM and representatives of the PIPE Investors were to be used to induce Plaintiffs to invest in what would become Akazoo; (2) Plaintiffs were a known party that Crowe intended to rely on these statements; and (3) Crowe engaged in linking conduct evincing the accountant's understanding of Plaintiffs' reliance.

123.   First, Crowe absolutely knew the 2017 Revised AFR and 2018 Revised AFR were designed specifically to induce Plaintiffs to consummate the merger. Both documents were edited from the original version that Crowe had produced as part of its normal audit procedures; in other words, these were extraordinary documents created for the sole purpose of inducing the merger.  Second, Crowe

knew that the 2018 Audit was to be used to consummate the merger.  For the 2018 Audit, Crowe signed an addendum to its normal engagement letter with Old Akazoo (the "Addendum") precisely because Crowe knew their Audit Report and the associated "audited" financial statements would be used to close the merger.  The Addendum acknowledged that the financial statements would be included the Proxy and Registration Statement to obtain approval for the merger with MMAC.

124.   Second, Plaintiffs were known a party because they were part of an identifiable, particularized group rather than "a faceless or unresolved class of persons."  For example, the PIPE Investors were relatively small group of several dozen private investors.  The number of the group was limited and easily resolved. Similarly, the SPAC Investors were a limited group of about a dozen investors who agreed to roll-over their investment in MMAC into the merged entity.

125.   Third, Crowe engaged in linking conduct with Plaintiffs.  Crowe, without the presence of their client, Old Akazoo, directly talked with representatives of the Plaintiffs.  Crowe spoke with RSM on multiple occasions in 2018 (December) and 2019 (January and September); the lead audit partner, Nigel Bostock participated in these calls.  Crowe also participated in accepting the editing of both the 2017 AFR and 2018 AFR so that it could be supplied to RSM, in edited form. Crowe also spoke directly with representatives of the PIPE Investors to answer questions about Old Akazoo's reported revenues and other matters.

126.   It is very unusual for an auditor to speak directly with prospective investors, especially, as in this situation, without their client present.  Furthermore, when auditors do speak with potential investors or other financiers, it is customary for the auditor to request a "non-reliance" agreement from the financier.  Crowe did not request such as non-reliance agreement from the call participant, so in essence, Crowe confirmed its expectation or understanding that there would be such reliance.

## XII.   Crowe Committed Fraud.

127.   Crowe committed fraud by its affirmative misstatements in its 2018 Audit Report.  In issuing the 2018 Audit Report, and further consenting to its use in the Proxy, Crowe acted with reckless disregard for the truth.

128.   Crowe's utter failure to take any steps to confirm the existence of the aggregators beyond relying on emails to/from a single email address purported belonging to an employee of each aggregator that was provided by Old Akazoo management is tantamount to conducting no audit at all, especially where almost all of the economic activity reported by the financial statements occurred at the aggregator level.   Crowe's auditing practices were so deficient that the audit amounted to no audit at all.  At a minimum, Crowe's lack of inquiry is tantamount to an egregious refusal to see the obvious or to investigate the doubtful such that Crowe acted with reckless disregard for the truth.

129.   Crowe also disregarded multiple red flags that (1) Crowe knew about and (2) raised serious question about the truth of the purported economic activity coming from the aggregators and reflected in Akazoo's financial statements.  First and foremost, as detailed above, Crowe encountered multiple red flags while conducting the 2018 Audit work.  *See supra* at ¶¶ 42-80.  For example, well into 2018, Old Akazoo's internal financials allegedly were incorrect, missing many of months of activity from the latter part of 2018.  There is no evidence Crowe investigated whether this was caused by an overwhelmed finance staff or simply reflected that the fact that financials were fictional.  When one aggregator confirmed as correct an allegedly "incorrect" balance, Crowe asked no questions.  When Crowe attempted to locate contact information for the aggregators, Crowe was unable to find anything.  Ultimately, Crowe was provided a single email address for each aggregator.  There is no evidence Crowe made any effort to contact the aggregators directly.  As if that were not bad enough, Crowe ultimately was provided a series of tri-partite settlement agreements that on their face are suspect because the transactions are inexplicable as a business matter.  The third-parties involved in these settlement agreements were suspect on their face, having in certain instance names similar to established entities but located in very different jurisdictions and with no internet presence.  Yet, Crowe made no effort to contact any of these third parties to confirm the legitimacy of the settlement agreements.

130.   Second, Crowe disregarded the red flags raised by Old Akazoo's relationship with the aggregators.  Old Akazoo essentially outsourced the entire financial transaction aspects of its  business to the aggregators.  This manifestly increased the risk of fraud at Old Akazoo, with most of its alleged business being conducted by third parties who Crowe was not auditing.  Crowe appears to have recognized this risk.  For example, the 2018 AFR lists actions taken by Crowe to determine if any instances of fraud existed; Crowe listed that it reviewed a "sample of contract for sales incentives for aggregators and upfront fees" and made "specific enquires with management of any side agreements with aggregators."  Crowe would not have taken these actions to determine if fraud existed unless Crowe realized the aggregator relationships posed a fraud risk.  While Crowe claims it examined this fraud risk, this claim is either false or simply illustrates more red flags ignored by Crowe.  Specifically, Crowe claims that it reviewed the contracts between Old Akazoo and the aggregators.  (Crowe had a professional responsibility to review these agreements, as well as perform audit procedures on the aggregators' internal controls, independent of any concern about potential risk of fraud given their materiality to Old Akazoo's finances.)  As noted above, rather than alleging any concerns about the risk of fraud, the contracts raise glaring red flags because they describe the aggregators providing a different service than Old Akazoo's management claimed.

131.   Third, given Crowe's four-year audit relationship with Old Akazoo, upon information and belief, Plaintiffs allege that Crowe knew that no one inside of Old Akazoo communicated with the aggregators other than two executives and that employees in the finance department did not even have a phone number at which to reach any employee of any aggregator.  This tight control of communication between Old Akazoo and the aggregators alone is a huge red flag.

132.   Fourth, Crowe was aware that Old Akazoo was not forthcoming about its relationship with the aggregators.  Crowe knew that Old Akazoo refused to reveal the names of the aggregators even to entities under non-disclosure agreements, such as RSM.  When Old Akazoo management edited Crowe's 2017 and 2018 AFRs to remove any such references, the purported reason given to Crowe was to protect commercially sensitive information.   This justification is nonsensical especially since the entities were described as "large third-party service providers":  Putting aside whether the name alone could ever be commercially sensitive, Crowe knew that RSM had signed an NDA and was being provided lots of confidential financial information about Old Akazoo.  Old Akazoo management's refusal to disclose the names made no sense.  This reluctance to reveal the identities of the aggregators was obviously yet another red flag.

133.   Fifth, Crowe was aware that Old Akazoo actively mischaracterized its business in public filings—specifically, the Proxy and Registration Statement—as

well in the purported audited notes to the financial statements.  As outlined above, the description provided to potential investors in the publicly-filed documents made false and misleading statements about the manner in which Akazoo obtained subscribers and generated revenue; omitted information about the critical and massively material role allegedly played by the aggregators; and to the extent aggregators were mentioned at all, the disclosures were misleading by describing the role as mere payment collection services—*e.g.*, credit card processors.  Crowe had been told by Old Akazoo management about the purported true nature of the aggregator relationship, and thus Crowe knew these descriptions provided by Old Akazoo were false and misleading.  The fact that management is willing to mislead investors is an obvious red flag, raising serious concerns about their credibility and honesty when preparing financial statements including the associated narrative footnotes.

134.  Sixth, Crowe absolutely knew that Old Akazoo management was willing to outright lie to RSM.  The proposed responses to RSM's questions that Old Akazoo's management fashioned—*see supra* at ¶ 120—were outright lies.  This also should have been a huge red flag that something seriously was amiss, and this alone should have given Crowe reason to consider resigning from their relationship with Old Akazoo.  Instead, they proceeded to participate in the scam.

135.   Seventh, Crowe knew that Old Akazoo management included notes to the financial statements that were misleading.  As described above, the notes deny the existence of any credit risk even though Old Akazoo's financial existence was essentially dependent on three aggregators paying Old Akazoo the outstanding receivables on a timely basis.  As well, the notes falsely describe the Company's investment in software.

136.   Eighth, Crowe had concerns about fraud at Old Akazoo from the outset of its engagement.  This alone is a significant red flag.  Worse, Crowe failed to implement any heightened or specialized auditing steps to address this risk.

**XIII.  Crowe Committed Fraud by Omission.**

137.   Crowe also committed fraud by omission.  By deciding to speak to Plaintiffs—particularly during the call with Mr. Kennedy on behalf of the PIPE Investors (and with RSM repeatedly)—Crowe assumed a duty to speak fully and truthfully.

138.   Mr. Kennedy expressly asked Crowe to characterize the relationship with Akazoo, whether Crowe encountered any concerns with the revenues flowing through the Cyrus and Dubai subsidiaries (the subsidiaries that had the contractual relationships with the aggregators although Mr. Kennedy did not know this at the time); and whether there was any evidence of the Company fraudulently manufacturing revenue.  In response, Crowe said there were no issues with

management and they had a good relationship; Crowe also confirmed that they thoroughly scrutinized the portions of the Company's business that flowed through Cyprus and Dubai and planned to continue to do so; and Crowe denied seeing any evidence Old Akazoo might be manufacturing revenues. Crowe did not mention any of the red flags that it had encountered. In doing so, Crowe acted with, at a minimum, a reckless disregard for the truth.

## XIV.  Crowe Aided and Abetted Old Akazoo's Fraud.

139.   Crowe aided and abetted the fraud committed by Old Akazoo's management. There is no dispute that Old Akazoo committed a fraud in order to close the merger. Old Akazoo committed a fraud against the SPAC Investors and PIPE Investors by making the false and misleading disclosures in the Proxy and Registration Statement. Old Akazoo also committed a fraud upon the SPAC Investors and PIPE Investors based on the representations made in the notes to the 2018 Financial Statements. Crowe read all these documents and knew, or should have known, that they were materially inconsistent with what Crowe understood the business and operation of Old Akazoo to be, which understanding formed the basis for the scope of Crowe's defective audit work.

140.   Crowe provided substantial assistance to Old Akazoo. Crowe did not simply provide regular auditing services to Old Akazoo. By engaging directly with the prospective investors who were conducting due diligence (something most

accounting firms are loathe to do), Crowe departed from its expected roll and went beyond what was required by its engagement agreements with Old Akazoo. Had Crowe not vouched for Old Akazoo, in particular regarding reported revenue, during these calls, the investments and therefore the merger would not have occurred.

141.   As evidenced by the episode involving the 2018 Revised AFR, Crowe also allowed Old Akazoo management to edit official audit documents prepared by Crowe and then pass them off as Crowe's independent work product. As noted above, the changes did not simply remove names but also eliminated nine substantive pages of information. Allowing a client to make changes to document prepared by the accounting firm and then passing it off as the work of the accountant is an incredible departure from any normal or accepted procedures or practices observed by auditing firms. These changes had the effect of concealing the identity of the purported aggregators and obscuring the true role allegedly played by the aggregators.

142.   Crowe also provided substantial assistance to Old Akazoo by repeatedly reviewing and commenting on various version of the Proxy and Registration Statement and by consenting to inclusion of Crowe's audit report.

143.   Crowe knew that Old Akazoo was committing a fraud. Crowe knew that the description of the business in the Proxy and Registration Statement was different from what Crowe had been told and different from the basis on which

Crowe should have designed its audit procedures and evaluation of risk and internal controls.  Crowe knew that the aggregators played a critical role in the business as Crowe understood it yet were not mentioned in any detail in the Proxy and Registration Statement.  At a minimum, Crowe acted with reckless disregard for Old Akazoo's fraud.

144.   Crowe also knew that the notes the 2018 Financial Statements were false and thus Crowe knew that Old Akazoo's management, who prepared the notes, was committing a fraud on readers of the financials, including potential investors. Crowe did nothing to correct this even though the false and misleading notes were included in the financial statements that Crowe purportedly audited.

**XV.   Reasonable Reliance.**

145.   The SPAC Investors relied on the 2018 audit and audit report and the statements in Proxy and Registration Statement in approving the merger at the MMAC Shareholder Meeting on August 28, 2019.  But for Crowe's representations, the SPAC Investors would not have voted to approve the merger or would have redeemed their MMAC stock.

146.   The SPAC Investors also relied on the representations made to RSM in the 2017 Revised AFR and telephone discussions with Crowe in late 2018 and early 2019.  RSM, which was hired by MMAC, represented the SPAC Investors, who were the owners of MMAC.  Moreover, had Crowe been forthcoming with RSM,

MMAC would never have agreed to the Merger Agreement or would have terminated it pursuant to its contractual rights; even if MMAC had not terminated the Merger Agreement, MMAC would have been required to disclose the truth of what Crowe disclosed to the SPAC Investors to inform their vote on whether to approve the merger and there is no chance the SPAC Investors would have voted to approve the merger or they would have redeemed their investment in MMAC immediately.

147.   The PIPE Investors relied on the statements in the Proxy and Registration Statement, including the 2018 Audit Report in deciding to sign Subscription Agreements for the PIPE Financing.   But for those Crowe representations, the PIPE Investors would not have invested.

148.   The PIPE Investors also relied on the due diligence call between Mr. Kennedy and Crowe in late August 2019.  At that point, had Crowe provided honest information, including mentioning any of the red flags surrounding the aggregator revenue, the PIPE Investors still could have backed out of the investment, which had not closed yet, or sought rescission immediately. This is particularly true because one impetus for Mr. Kennedy's inquiries was a potential PIPE investor raising a concern that Dubai and Cypress were notorious jurisdictions for fraudulent activity and lack of regulatory oversight; had Mr. Kennedy heard anything concerning on the call, he would have alerted the potential investors and most likely either

requested a merger delay for further diligence or recommended that the investors not invest.

149.   All Plaintiffs relied on the due diligence follow-up by RSM in late August 2019 and early September 2019.  At that point, had Crowe told RSM the truth or alerted RSM to any of the red flags about which Crowe was aware regarding the aggregators, MMAC could have terminated the Merger Agreement.  The PIPE Investors also relied on the representations made to RSM because Mr. Kennedy received a copy of RSM's updated due diligence report prepared after RSM reviewed the 2018 AFR.

150.   To the extent Plaintiffs' claims are premised on omissions, reliance is presumed.

## CLAIMS FOR RELIEF

## COUNT ONE – VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT [15 U.S.C. § 78j(b)] AND RULE 10b-5 THEREAFTER [17 C.F.R. § 240.10b-5]

151.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

152.   By engaging in the conduct described herein, Crowe, directly or indirectly, singly or in concert with others, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities,

knowingly or recklessly: (a) employed devices, schemes, and artifices to defraud; and/or (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities and upon other persons.

153.   Crowe, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

154.   Crowe acted with scienter in that it knew that the 2018 Audit and the 2018 AFR were materially false and misleading; knew that such statements or documents would be issued or disseminated to investors; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  Crowe by virtue of its receipt of information reflecting the true facts of the Company, its control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which

made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

155.   But for these misrepresentations, Plaintiffs would not have purchased the Company's securities.

156.   As a result of the wrongful conduct alleged herein, Plaintiffs have suffered damages in an amount to be established at trial.

157.   By reason of the foregoing, Crowe has violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs for substantial damages which they suffered in connection with their purchases of Akazoo's securities.

## COUNT TWO – NEGLIGENT MISREPRESENTATION

158.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

159.   Crowe, in the course of its business, profession, or employment, and in the course of a transaction in which it had a financial interest, supplied false information, namely, its 2018 Audit Report regarding Old Akazoo, its various oral communications with representatives of Plaintiffs, and the heavily edited 2018 AFR, for the guidance of Plaintiffs in a business transaction. Crowe failed to exercise reasonable care or competence in obtaining and communicating this information as described above.  Crowe knew that investors including Plaintiffs would rely on this

information, and that investors including Plaintiffs would use the information when deciding to invest in the business combination.

160.   Crowe was manifestly aware that these representations would be used to convince the SPAC Investors to roll over their investment into Akazoo and vote to approve the business combination and to convince the PIPE Investors to invest to fund the business combination.

161.   Plaintiffs justifiably relied on Crowe's representations as described above.

162.   Had Crowe followed the applicable standards of the accounting profession—which, as detailed above, it did not—it would not have made the misrepresentations upon which Plaintiffs relied and because of which Plaintiffs have suffered damages.   In particular, Crowe never would have issued their audit report upon which Plaintiffs relied.   Had Crowe performed appropriate audit procedures responsive to the high-risk nature of Old Akazoo it would have uncovered the fraud directly, or used professional skepticism and focused on the "red flags" they would have likely either not accepted the engagement or resigned.

163.   As a direct and proximate cause of their justifiable reliance on Crowe's deceptive misrepresentations, Plaintiffs were damaged.   Plaintiffs are therefore entitled to compensatory damages, specifically, the return of the consideration paid

for Plaintiffs' investments, which were rendered worthless, plus interest at the legal rate.

## COUNT THREE – FRAUD

164.   Plaintiffs incorporate by reference each of the preceding paragraphs.

165.   Plaintiffs, without knowledge of the falsity of Crowe's false statements in the 2018 Audit Report and of the material omissions described above, and believing such statements to be true and complete, and in reasonable and justifiable reliance upon Crowe's false statements approved the merger and made investments in reliance upon the truth and completeness of the statements contained in Crowe's false statements.  The SPAC Investors would not have voted to approve the merger or would have redeemed, or the PIPE Investors would not have invested were it not for Crowe's false statements.

166.   Crowe knew and expected that its false statements would be distributed to the SPAC Investors and the PIPE Investors, and that Plaintiffs would rely on statements made to their representatives.

167.   At the time the statements and representations were made by Crowe, they were false, and Crowe knew them to be false or acted with reckless disregard for the truth as they knew it.  Crowe knew or recklessly disregarded that Old Akazoo's financial statements did not represent fairly the Company's financial condition and that Crowe had violated governing professional standards in auditing

Old Akazoo's financial statement and system of internal controls. Crowe nevertheless misrepresented to the contrary both in the financial statements and in discussions with RSM and a representative of the PIPE Investors. Crowe also knew or recklessly disregarded that the 2018 Revised AFR did not accurately reflect Old Akazoo's business and omitted critical information needed to make the statements contained therein not misleading. Crowe nevertheless allowed Old Akazoo's management to provide the report under Crowe's name to RSM.

168. Crowe intended to deceive Plaintiffs by making such statements and representations and, for just one important example, proactively did so in their call with a representative of the potential investors. At the time of the false statements, misrepresentations, and omissions, Crowe intended that Plaintiffs would act on the basis of the misrepresentations and omissions contained in the materials and representations in deciding whether to support the merger and to invest and Plaintiffs reasonably relied on the misrepresentations and omissions to their detriment in making such decisions.

169. Had Plaintiffs known of the material facts which Crowe wrongfully concealed and/or misrepresented, and of the falsity of Crowe's representations, Plaintiffs would not have supported the merger, agreed to exchange their existing stock for New Akazoo stock, and would not have invested.

170.   Crowe also committed fraud by omission when Crowe failed to inform Mr. Kennedy or RSM about the red flags that Crowe had encountered during the 2018 Audit.  Had Crowe mentioned any of this, MMAC would have called off the merger and/or the PIPE Investors would have refused to close on their investment.

171.   Plaintiffs by reason of Crowe's wrongful concealments and misrepresentations, have sustained damages and have lost a substantial part of their investment, together with lost interest and general and incidental damages in an amount yet to be determined, and to be proven at trial.

172.   Crowe's fraudulent acts were willful, wanton and aimed at the public generally.  Therefore, Plaintiffs are entitled to punitive damages.

## COUNT FOUR – AIDING AND ABETTING FRAUD

173.   Plaintiffs incorporate by reference each of the preceding paragraphs.

174.   Crowe was aware of the fraud being perpetrated by Old Akazoo's management.

175.   Crowe knowingly or recklessly facilitated the fraud by Old Akazoo by serving as Old Akazoo's auditor, by agreeing to provide the altered Audit Findings Reports to provide to prospective investors, aggreging to permit the 2018 Audit Report to be included in the Proxy and Registration Statement, and agreeing to speak with a representative of prospective investors who were conducting due diligence.

Crowe knowingly or recklessly committed fraud and aided and abetted the fraud committed by the Old Akazoo's management.

176.   By reason of Crowe's wrongful aiding and abetting, Plaintiffs have sustained damages and has lost a substantial part of their investment, together with lost interest and general and incidental damages in an amount yet to be determined, and to be proven at trial.

177.   Crowe's acts were willful, wanton and aimed at the public generally. Therefore, Plaintiffs are entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Crowe as follows:

A.   Awarding damages in favor of Plaintiffs against Crowe for all damages sustained as a result of Crowe's violations of the First, Second, Third, and Fourth Cause of Action;

B.   Awarding Plaintiffs the costs of suit, including reasonable attorneys' fees, costs, and expenses; and

C.   Granting such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: March 22, 2022                    Respectfully Submitted,

                                         HOLZER & HOLZER, LLC

*/s/Marshall P. Dees*
Corey D. Holzer
Ga. Bar No. 364698
Marshall P. Dees
Ga. Bar No. 105776
Joshua A. Karr
Ga. Bar No. 202783
211 Perimeter Center Parkway, Suite 1010
Atlanta, GA 30346
(770) 392-0090
cholzer@holzerlaw.com
mdees@holzerlaw.com
jkarr@holzerlaw.com


Vineet Bhatia (*pro hac vice* to be filed)
Harry Susman (*pro hac vice* to be filed)
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
vbhatia@susmangodfrey.com
hsusman@susmangodfrey.com

Marc Seltzer (*pro hac vice* to be filed)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 789-3100
mseltzer@susmangodfrey.com

Jillian Hewitt (*pro hac vice* to be filed)
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, New York 10019
Telephone: (212)336-8330
jhewitt@susmangodfrey.com